**UNITED STATES v. NICHOLS.**

**UNITED STATES v. BOLLER.**

**UNITED STATES v. KEAS.**

Civ. Nos. 403, 567, 568.

United States District Court
N. D. Iowa.
June 4, 1952.

Tobias E. Diamond, U. S. Dist. Atty., Sheldon, Iowa, and William B. Danforth, Asst. U. S. Dist. Atty., Sioux City, Iowa, for the United States.

Eldon J. Huisman, of DeWolf, Goodman & Huisman, Grundy Center, Iowa, for defendant Dale William Nichols.

Harry M. Reed and R. Bruce Hughes, of Reed & Beers, and Fred G. Clark, of Clark & Clark, Waterloo, Iowa, for defendants Paul Holtman Boller and Francis G. Keas.

GRAVEN, District Judge.

In these cases the United States seeks to recover from the defendants insurance premiums paid by the United States on commercial insurance policies held by the defendants at the time they entered the military service of the United States. The payments were made under the provisions of the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C.A.Appendix, § 501 et seq. The cases are separate cases and were tried separately. Since they all involve a similar question, this opinion covers all three cases. It appears that the question in these cases has not heretofore been judi-

cially passed upon. It was indicated in argument that there are many thousands of ex-servicemen who are situated similarly to the defendants in these cases and that these cases are in the nature of test cases.

On January 10, 1941, the defendant Dale William Nichols took out a policy of ordinary life insurance with the American Mutual Life Insurance Company in the face amount of $5,000. He paid a monthly premium on such policy on that date. He entered into the military service of the United States on February 10, 1941. On February 11, 1941, he made application to the Veterans' Administration for benefits under Article IV of the Soldiers' and Sailors' Civil Relief Act of 1940 with respect to such policy. The application was approved by the Veterans' Administration by notice of approval on March 24, 1941. The defendant Dale William Nichols was honorably separated from the military service of the United States on August 30, 1945. The policy lapsed and was terminated on August 30, 1947, for non-payment of the premiums then due thereon. On August 30, 1947, the American Mutual Life Insurance Company submitted to the Veterans' Administration a statement of account containing a statement of the premiums and interest due on said policy, the dividend and interest credits against the premiums, and the cash surrender value of the policy at the time of its termination, showing a balance in favor of the American Mutual Life Insurance Company in the sum of $447.03 and making claim to the Veterans' Administration for payment of that amount. On September 12, 1947, the Veterans' Administration determined that the American Mutual Life Insurance Company was entitled to payment of the said sum of $447.03, and that sum was thereafter paid to such company by the United States. By certificate of indebtedness dated February 20, 1951, the Comptroller General of the United States certified that the defendant Dale William Nichols owed the United States the sum of $447.03, to which indebtedness had been credited the sum of $251.90, being the amount of the National Service Life Insurance dividend of the defendant Dale William Nichols, leaving a balance owing the

United States of $195.13. Civil Action Number 403 was commenced in this Court against the defendant Dale William Nichols on January 8, 1952, for the repayment of the sum of $195.13. On January 30, 1952, the defendant Dale William Nichols filed his counterclaim against the United States in the amount of $251.90, being the amount of the National Service Life Insurance dividend of said defendant.

On November 1, 1941, the defendant Paul Holtman Boller took out a policy of whole life insurance with the Mutual Trust Life Insurance Company in the face amount of $2,500. He paid a quarterly premium on such policy on that date. He entered into the military service of the United States on January 20, 1942. On January 26, 1942, he made application to the Veterans' Administration for benefits under Article IV of the Soldiers' and Sailors' Civil Relief Act of 1940 with respect to such policy. The application was approved by the Veterans' Administration by notice of approval on February 19, 1942. The defendant Paul Holtman Boller was honorably separated from the military service of the United States on October 16, 1945. On October 14, 1946, he made application to the Veterans' Administration for withdrawal of said policy from the benefits of Article IV of the Soldiers' and Sailors' Civil Relief Act of 1940. Pursuant to the application for withdrawal the policy was terminated effective October 1, 1946. On December 6, 1946, the Mutual Trust Life Insurance Company submitted to the Veterans' Administration a statement of account containing a statement of the premiums and interest due on said policy, the dividend and interest credits against the premiums, and the cash surrender value of the policy at the time of its termination, showing a balance in favor of the Mutual Trust Life Insurance Company in the sum of $122.95 and making claim to the Veterans' Administration for payment of that amount. On January 3, 1947, the Veterans' Administration determined that the Mutual Trust Life Insurance Company was entitled to payment of the said sum of $122.95, and that sum was thereafter paid to such company by the United States. By certificate of in-

debtedness dated December 26, 1950, the Comptroller General of the United States certified that the defendant Paul Holtman Boller owed the United States the sum of $122.95. Civil Action Number 567 was commenced in this Court against the defendant Paul Holtman Boller on January 8, 1952, for the repayment of the sum of $122.95.

On December 26, 1940, the defendant Francis G. Keas took out a policy of ordinary life insurance with the American Mutual Life Insurance Company in the face amount of $5,000. He paid a monthly premium on such policy on that date. He entered into the military service of the United States on February 10, 1941. On February 18, 1941, he made application to the Veterans' Administration for benefits under Article IV of the Soldiers' and Sailors' Civil Relief Act of 1940 with respect to such policy. The application was approved by the Veterans' Administration by notice of approval on March 31, 1941. The defendant Francis G. Keas was honorably separated from the military service of the United States on April 30, 1941. The policy lapsed and was terminated on April 30, 1942, for non-payment of the premiums then due thereon. On November 3, 1944, the American Mutual Life Insurance Company submitted to the Veterans' Administration a statement of account containing a statement of the premiums and interest due on said policy. There were no dividend credits against such premiums, and the policy had no cash surrender value. The statement of account showed a balance in favor of the American Mutual Life Insurance Company in the sum of $169.18, and the insurance company made claim to the Veterans' Administration for payment of that amount. On November 20, 1944, the Veterans' Administration determined that the American Mutual Life Insurance Company was entitled to payment of the said sum of $169.18, and that sum was thereafter paid to such company by the United States. By certificate of settlement dated August 30, 1950, the Comptroller General of the United States certified that the defendant Francis G. Keas owed the United States the sum of $169.18. Civil Action Number 568 was commenced in this Court against the defendant Francis G. Keas on January 8, 1952, for the repayment of the sum of $169.18.

The question presented by these cases requires a consideration of the pertinent provisions of the Soldiers' and Sailors' Civil Relief Act of 1940. An excellent discussion of the provisions of that Act is found in an article by Karl R. Bendetson, Captain Judge Advocate General's Department, U. S. Army, at pages 1–43, Washington & Lee Law Review, 1940 Vol. II, entitled " A Discussion of the Soldiers' and Sailors' Civil Relief Act of 1940. " It is indicated in such article that on July 29, 1940, the President of the United States requested Congress for authority to order the National Guard to active duty. The so-called " National Guard Bill, " Public Resolution No. 96, 76th Cong., 3d Sess., was approved August 27, 1940, 50 U.S.C.A.Appendix, §§ 401–405. Section 4 of Public Resolution No. 96 provided, in part, as follows:

"The benefits of the Soldiers and Sailors Relief Act, approved March 8th, 1918, are hereby extended to all * * * personnel ordered into the active military service under authority of this joint resolution * * * and except as hereinafter provided, the provisions of such Act shall be effective for such purposes." 54 Stat. 860.

A similar provision appeared in the Selective Training and Service Act of 1940, c. 720, 54 Stat. 885, 50 U.S.C.A.Appendix, §§ 301–318, approved September 16, 1940. There was some question as to the legal effect of the attempt to revive the 1918 Act, which had expired following World War I, and it was felt that there was necessity for revising such Act in certain particulars. Consequently bills were introduced into both the House and the Senate, resulting in the passage of the Soldiers' and Sailors' Civil Relief Act of 1940. See also, remarks of Senator Gurney, 86 Cong. Rec., Part II, pp. 12,837–12,838, 76th Cong., 3d Sess., Sept. 30, 1940, reprinted in 50 U.S.C.A.Appendix, Vol. 1, pp. 494–499; Reed, Soldiers' and Sailors' Civil Relief Act of 1940, 28 Iowa Law Review 14–36 (1942).

The Soldiers' and Sailors' Civil Relief Act of 1940, 54 Stat. 1178 et seq., was approved by the President of the United States on October 17, 1940. Such Act, as amended, appears as 50 U.S.C.A. Appendix, §§ 501–590. A portion of the legislative history of the original 1940 Act is reprinted in 50 U.S.C.A.Appendix, Vol. 1, at pages 488–499. As indicated in House Report No. 3001, 76th Cong., 3d Sess., the 1940 Act covered such matters as:

" * * * stay of court proceedings, stay of executions, protection of plaintiffs and defendants absent on military and naval service, noneviction for failure to pay rent, suspending foreclosures of mortgages for failure to meet scheduled installments, suspension of the lapsing of insurance for default in payment of premiums, prohibiting repossession of property purchased under a contract of conditional sale without court action, prohibiting irrevocable sale of property for nonpayment of taxes (for a limited period), extension of the running of the statute of limitations; * * *."

The provisions of the 1940 Act dealing with insurance were in Article IV of such Act. Section 400 of such Article defined the terms "policy," "premium," "insured," and "insurer." Section 401 stated that the benefits of the Article should apply to any person in the military service who was the holder of a policy of life insurance and who applied to the Veterans' Administration for benefits under the Article. Section 402 limited availability of the benefits of the Act to contracts of insurance not exceeding $5,000 in face value, and made not less than 30 days before entry of the insured into military service. That Section excluded policies having more than a year's premiums unpaid or a policy loan of at least 50 per centum of the cash surrender value. Section 403 provided that the Veterans' Administration should reject the applications of persons not in military service and applications with respect to policies excluded from the benefits of the Article. Section 404 provided for the action to be taken by the Veterans' Administration in the event

any person applied for benefits with respect to one or more policies exceeding a total face value of $5,000. Section 405 provided as follows:

"No policy which has not lapsed for the nonpayment of premium before the commencement of the period of military service of the insured, and which has been brought within the benefits of this article, shall lapse or be forfeited for the nonpayment of premium during the period of such service or during one year after the expiration of such period: Provided, That in no case shall this prohibition extend for more than one year after the date when this Act ceases to be in force."

Sections 406 and 407 provided for the reporting of unpaid premiums by the insurance companies and for the issuance of certificates therefor by the Veterans' Administration. Section 408 provided as follows:

"The certificate so delivered shall be held by the respective insurers as security for the payment of the defaulted premiums with interest. To indemnify it against loss the United States shall have a first lien upon any policy receiving the benefits of this article, subject only to any lien existing at the time the policy became subject to this Act, and no loan or settlement or payment of dividend shall be made by the insurer on such policy which may prejudice the security of such lien. Before any dividend is paid or any loan or settlement is made the written consent of the Veterans' Administration must be obtained."

Section 409 provided as follows:

"In the event that the military service of any person being the holder of a policy receiving the benefits of this article shall be terminated by death, the amount of any unpaid premiums, with interest at the rate provided for in the policy for policy loans, shall be deducted from the proceeds of the policy and shall be included in the next monthly report of the insurer as premiums paid."

Section 410 provided as follows:

"If the insured does not within one year after the termination of his period of military service pay to the insurer all past due premiums with interest thereon from their several due dates at the rate provided in the policy for policy loans, the policy shall at the end of such year immediately lapse and become void, and the insurer shall thereupon become liable to pay the cash surrender value thereof, if any: Provided, That if the insured is in the military service when this Act ceases to be in force, such lapse shall occur and surrender value be payable at the expiration of one year after the date when this Act ceases to be in force."

Section 411 provided as follows:

"At the expiration of one year after the date when this Act ceases to be in force there shall be an account stated between each insurer and the United States, in which there shall be credited to the insurer the total amount of the certificates held as security under this article, together with accrued interest to the date of the account, and in which there shall be credited to the United States the amount of the cash surrender value of each policy lapsed or forfeited as provided in section 410, but not in any case a greater amount on any policy than the total of the unpaid premiums with interest thereon at the rate provided for in the policy for policy loans."

Section 412 provided as follows:

"The balance in favor of the insurer in each case shall be certified by the Administrator of Veterans' Affairs to the Secretary of the Treasury, who shall pay to the insurer the amount thereof, which is hereby authorized to be appropriated, out of any moneys in the Treasury not otherwise appropriated, upon the surrender by the insurer of the certificates delivered to it from time to time by the Administrator of Veterans' Affairs under the provisions of this article."

Sections 413 and 414 made further limitations on the applicability of the Act with respect to certain policies and insurance companies.

The insurance provisions in Article IV of the Act are explained in the article by Bendetson, supra, as follows (pp. 14–15):

"In general, it provides for the guarantee of premiums on life insurance up to a total insurance face value of $5,000.00, whether on one or more policies, where an insured in military service applies for the benefit of the article. The article covers any contract of life insurance on the level premium or legal reserve plan. It includes any benefit in the nature of life insurance arising out of membership in a fraternal or beneficial association. No policy is eligible for guarantee of premiums where there is an outstanding loan or other indebtedness equal to or greater than fifty per cent of the cash surrender value of the policy. Policies on which premiums have been unpaid for a period of a year or more are also ineligible. Where an individual applies for the benefit of the article, he must send the original of the application, on a form prepared by the Administrator of Veterans' Affairs to the insurer, and a copy to the Veterans' Administration. If the Veterans' Administration finds that the policy is eligible for coverage, and the insurer consents to whatever modifications of the insurance contract are necessary, the United States Government, in effect, guarantees payment of the necessary premiums over the period of military service. Thus lapse is prevented during such service. Certificates of the United States, bearing interest at a rate to be prescribed from time to time by the Secretary of the Treasury are issued to each insurer covering the amount of premiums guaranteed by the Government in each company and . in each fraternal or beneficial association. At the end of one year after the act ceases to be in force, the accounts between the United States and each insurer are

settled and upon surrender of the certificates by the insurer to the Secretary of the Treasury, payment is made out of any moneys in the Treasury not otherwise appropriated. In order to arrive at the account stated between the Government and the insurer, the method employed is this: Each insured is given one year following the termination of his military service, which under subdivision (2) of section 101 cannot be later than the date when the act ceases to be in force, during which to pay to his insurer all past due premiums, that is, those guaranteed by the Government, together with those which might have been in default at the time of application for coverage. If this is not done, the policy lapses and becomes void. At this time there is credited to the United States the total cash surrender value of the policy plus any past due premiums which the insured might have paid. This credit is offset against the face value of the certificates held as security by each insurer. The difference, if any, is paid by the Government to the insurer. If the cash surrender value in any instance is greater than the amount of past due premiums, the over-plus goes to the insured. During the last war, the loss to the Government was negligible. It aggregated under $20,000.[21]"

Footnote 21 of the Bendetson article reads as follows:

"During the last World War the Government guaranteed an aggregate of $362,399.50 in insurance premiums and recovered all but $19,518.40 of the premiums thus guaranteed. (See Annual Report of Director, United States Veterans' Bureau, 1924, page 445.)"

As heretofore noted, each of the defendants in the present cases was the holder of a policy of life insurance when he entered the military service of the United States. Each defendant applied for and received the benefits of the Soldiers' and Sailors' Civil Relief Act of 1940 with respect to his policy of life insurance. In each case the insured made only one premium payment on his policy prior to his entry into military service and made no payments of premiums on his policy after entering military service. In each case there were premium payments in default on the policy at the time of its termination, which premium payments, with interest, (less interest credits, dividend credits, and the cash surrender value of the policies in the cases of Paul Holtman Boller and Dale William Nichols) were paid by the United States. It is the claim of the plaintiff that such premium payments by it, pursuant to the Soldiers' and Sailors' Civil Relief Act of 1940, were not made as gratuities to the defendants. It is the claim of the plaintiff that it acted merely as a guarantor of the payment of such premiums, and that each defendant was the principal debtor with respect to the premiums in default on his policy. It is the claim of the plaintiff that the premiums were paid by it as guarantor only, and that, as guarantor, it should be reimbursed for such payment by the one principally liable for the payment of such premiums.

It is the claim of the defendants that the Soldiers' and Sailors' Civil Relief Act of 1940 did not provide that those applying for its benefits with respect to life insurance policies must repay the United States for any premium payments made by the United States on such policies. It is the claim of the defendants that such Act, by implication, limited the indemnification of the United States to the extent specified in Sections 408–411, i. e., a first lien on the proceeds of the policy in the event of death of the insured (to the extent of the unpaid premiums and interest thereon), or an offset of the cash surrender value of the policy against the unpaid premiums in the event the policy lapsed. It is the further claim of the defendants that the United States could not have been merely the guarantor of their debts, because they owed no debts with respect to the premiums on their policies. Therefore, argue the defendants, the United States could not have paid merely as guarantor, and thus has no right to reimbursement.

It is without dispute that the Soldiers' and Sailors' Civil Relief Act of 1940 is silent as to whether or not one applying for benefits thereunder with respect to a

policy of life insurance must reimburse the United States for payments of premiums and interest made by it to commercial insurance companies. The parties are in agreement that such silence is sufficiently ambiguous to warrant reference to extrinsic aids in order to discover the legislative intent as to this matter. Both the plaintiff and the defendants cite legislative history and other items as indicative of a legislative intent consistent with the claims advanced by them in this litigation. The issue then becomes, which legislative intent is the more clearly indicated—that the applicant under the Act should reimburse the United States for payments made with respect to his life insurance under the Act or that he should not have to do so?

As heretofore noted, the defendants strongly urge that the provisions in the 1940 Act for reimbursing the United States from the proceeds of the policy in event of death of the insured, and for crediting to the United States the amount of the cash surrender value in the event the policy lapsed, and the silence of the Act with respect to any further reimbursement, all imply that Congress did not intend that there would be any further reimbursement. In support of this contention the defendants refer to the following statement, which appears in House Report No. 3001, 76th Cong., 3d Sess., which was the report of the House Committee on Military Affairs on H.R. 10388, which was substantially identical to the bill which was finally enacted (excerpts from which report are reprinted in 50 U.S.C.A.Appendix, Vol. 1, at 488–492):

> "In the case of life-insurance policies, upon application by a person in military service the Administrator of Veterans' Affairs may guarantee payment of premiums in order to prevent lapsing or forfeiting of policies. Such persons may, within 1 year after leaving the military service, pay up premiums unpaid by them and resume payments of regular premiums. If they do not, the policy lapses and the cash-surrender value accrues to the Government to the extent necessary to meet the cost of the premiums which it has guaranteed."

An almost identical statement appears in Senate Report No. 2109, 76th Cong., 3d Sess.

The defendants also cite the construction placed upon the Act by the Veterans' Administration as indicative of what the intent of Congress must have been with respect to the matter of reimbursement. They cite the following items, as showing that the Veterans' Administration construed the Act to mean that the insured did not have to repay the United States for premium payments made under the Act: (1) In the application form supplied to the applicant for benefits under the 1940 Act (Insurance Form 380) it is stated just above the line provided for the applicant's signature:

> "In consideration hereof, I hereby consent and agree that the United States shall be protected in the amount of any premiums and interest guaranteed on the above numbered policy in the event of its maturity as a claim, or out of the cash surrender value of the policy, at the expiration of the period of protection under the Act."

It is the claim of the defendants that this was an express contract limiting the applicant's duty to indemnify the United States to the extent specified, and negating any implied contract of indemnity under general principles of common law. (2) In Veterans' Administration Insurance Form 385, which was an information form purporting to explain the insurance provisions of the Soldiers' and Sailors' Civil Relief Act of 1940, nothing was stated about the insured's having to repay the United States for premium payments made by it, but it was stated that the United States should have a lien upon the policy, that unpaid premiums would be deducted from the proceeds of the policy if it matured as a claim, and that the cash surrender value should be credited on the indebtedness if the policy lapsed. (3) In a statement to a weekly newspaper known as "The Eastern Underwriter," reprinted in the January 31, 1941, issue of such newspaper, Harold W. Breining, Assistant Administrator, Finance and Insurance, Veterans' Administration, stated as follows:

"There is no provision in the Act at this time for collecting from the insured the amount that the premium with interest may exceed the cash surrender value at the time of termination."

(4) In a telegram sent about December 22, 1940, in response to a telegram sent by one Stewart C. Henig which asked if repayment was necessary, H. L. McCoy, Director of Insurance of the Veterans' Administration, stated as follows:

"Retel Civil Relief Act of 1940 No Provision Is Made in Act for Collecting from Insured the Amount Paid by Government to Insurer."

(5) In a letter dated February 21, 1941, written to the Jefferson Standard Life Insurance Company in response to a letter inquiring, in substance, whether the insured would have to repay the United States for premium payments made on his insurance, H. L. McCoy, Director of Insurance of the Veterans' Administration wrote:

"There is no provision in the Act whereby the Government may be reimbursed by the policyholder in the amount paid to the insurer in those cases where there was no cash surrender value or where such value was insufficient to cover the indebtedness."

(6) In a letter dated March 28, 1941, written to a Robert Johnson, H. L. McCoy, Director of Insurance of the Veterans' Administration, made a statement identical to the one in his letter of February 21, 1941, to the Jefferson Standard Life Insurance Company. (7) In a statement made before the House of Representatives Committee on Military Affairs on May 25, 1942, Harold W. Breining, Assistant Administrator, Finance and Insurance, Veterans' Administration, stated as follows:

"The insured is liable for all of the premiums of the $5,000 policy, the Government acting really as a guarantor. However, if there is a default, there would not be any liability for the whole amount, in excess of the cash value under present construction of existing law."

The defendants also cite a portion of the 1942 Amendment to the Soldiers' and Sail-

ors' Civil Relief Act of 1940, and certain of the legislative history of such Amendment as indicative of an intent on the part of the Congress which passed the 1940 Act that the insured did not have to repay the United States for premiums paid on his insurance under the 1940 Act. The Amendment to which the defendants refer was the Act of October 6, 1942, c. 581, § 13, 56 Stat. 773 et seq., which Act appears as 50 U.S.C.A.Appendix, §§ 540-548. The defendants make reference in particular to the amendment to former Section 406 of the 1940 Act, which amended section appears as 50 U.S.C.A.Appendix, § 546, a portion of which reads as follows:

"The amount paid by the United States to an insurer on account of applications approved under the provisions of this article, as amended, shall become a debt due to the United States by the insured on whose account payment was made and, notwithstanding any other Act, such amount may be collected either by deduction from any amount due said insured by the United States or as otherwise authorized by law."

The defendants argue, with reference to the 1942 Amendment, that by thus specifically providing for the first time that the amount paid by the United States was a debt owed by the insured, Congress must have assumed that the 1940 Act did not provide for repayment by the insured. They contend that if the 1940 Act had provided for repayment, the 1942 Amendment would have accomplished nothing, and that Congress cannot be presumed to have passed legislation which had no effect upon prior law. The defendants also cite certain of the legislative history of the 1942 Amendment. They make reference to a statement in Senate Report No. 1558, 77th Cong., 2d Sess., which report was the report of the Senate Committee on Military Affairs on H.R. 7164, the bill which later became the 1942 Amendment to the Soldiers' and Sailors' Civil Relief Act of 1940, which statement was that certain of the provisions of such bill would:

" * * * exclude a policy issued on a term plan or a policy arising out of a

fraternal or beneficial association which has no cash surrender value, and will bar protection of a policy which the insured applied for shortly before entering the military or naval service with the intention of having the Government pay for protection during his period of active service which he does not intend to carry thereafter."

The defendants contend that by this statement the committee implied that under the 1940 Act, the insured could have had insurance which the Government would pay for, and for which the insured would not be liable. The defendants also make reference to a statement in House Report No. 2481, 77th Cong., 2d Sess., which report was a conference report on H.R. 7164, the bill which later became the 1942 Amendment, which statement was made by the Managers on the part of the House, and was as follows:

"Under the House bill, any amounts paid by the United States to an insurer on account of approved applications do not become a claim against the owner of the policy. The Senate amendment (sec. 406) made such payments a debt due to the United States and authorized collection by deduction from any future amounts due the insured by the United States. The conference agreement retains the Senate provision."

The defendants contend that this statement supports their contention that the 1942 Amendment changed the 1940 Act with respect to the insured's duty to repay the United States and imposed such duty for the first time. The defendants make similar claims for a similar statement by Representative John Sparkman which appears on page 7545 of the Congressional Record, 77th Cong., 2d Sess., September 28, 1942. The defendants also point out that in various statements of the purposes of the bill which became the 1942 Amendment, in the committee reports and in the Congressional Record, there appeared the language that the bill was "to change certain insurance provisions." The defendants contend that such statements tend to indicate that Congress meant to change the prior law as to

repayment of the United States for premium payments.

The plaintiff contends that the insurance provisions of the Soldiers' and Sailors' Civil Relief Act of 1940 should be construed in the light of the purpose of the entire Act. The plaintiff contends that the Act was not intended by Congress to confer gratuitous benefits on those in military service, but merely to protect the person in military service from suffering loss in his personal affairs because of his military service by suspending certain proceedings and transactions until he was discharged from the service. The plaintiff makes reference to House Report No. 3001, 76th Cong., 3d Sess., a portion of which has been heretofore quoted. That committee report stated, in part, as follows:

"This bill would free persons in the military service of the United States from harassment and injury in connection with their civil affairs during their terms of service and thus enable them the more successfully to devote their entire energies to the military needs of the Nation. [There follows a statement of the subjects covered by the act, which statement has been heretofore quoted herein] * * * in short, the method of the Soldiers' and Sailors' Relief Act consists mainly in suspending proceedings and transactions during the soldier's or sailor's absence so that he might have an opportunity when he returns to be heard and to take measures to protect his interests."

The plaintiff also points out that in Section 408 of the 1940 Act, it was provided that the United States should have a lien on the policy "To indemnify it against loss * *." The plaintiff further points out that in House Report No. 3001, supra, it was stated that the United States should "guarantee" payment of the premiums. The plaintiff contends that these items indicate that Congress intended that the United States should be liable for payment of the premiums as guarantor only, that Congress did not intend that the United States should provide free insurance for applicants under the Act, and that the insured

should indemnify the United States for payments of insurance premiums pursuant to the Act. The plaintiff contends that the express provisions in the Act for a lien on the policy and for repayment out of the proceeds or the cash surrender value did not necessarily mean that Congress intended to release the applicant receiving benefits under the Act from his common law duty to reimburse the United States for paying his debt.

With respect to the contentions of the defendants based on the construction given to the 1940 Act by the Veterans' Administration, the plaintiff points out that in none of the items cited by the defendants did the Veterans' Administration say that the insured did not have to repay the United States for payments made on his insurance, but that the statements were merely that the Act did not provide for such repayment. With respect to the statement of Harold W. Breining before the House Committee on Military Affairs on May 25, 1942, heretofore set out, the plaintiff contends that the "construction of existing law" referred to by Mr. Breining was erroneous, did not represent any position formally taken by the Veterans' Administration, and is not binding on the Government.

The plaintiff also points out that in Administrator's Decision No. 513, announced March 1, 1943, and in Administrator's Decision No. 742, announced April 1, 1947, the Veterans' Administration formally took the position that payments of insurance premiums made by the United States pursuant to the original 1940 Act must be repaid by the insured. In the latter Administrator's Decision, the Veterans' Administration denied that there had ever been an administrative construction of the Act to the effect that such payments were gratuities, and claimed that prior to the Administrator's Decision of March 1, 1943, "administrative action under the law had not proceeded far enough to establish any fixed practice in respect to the question now under examination."

It is the contention of the plaintiff that the 1942 Amendment merely confirmed and made specific what had previously been the law under the 1940 Act—that the 1942 Amendment merely codified the common law duty of the insured to reimburse the United States which existed under the 1940 Act. The plaintiff contends that the references in committee reports and in the Congressional Record to "changes in certain insurance provisions" refer to matters other than the subject of reimbursement.

It is the further contention of the plaintiff that if the construction it claims for the 1940 Act is not adopted then those applicants whose insurance policies had large enough cash value to cover the cost of the premiums paid by the Government, or who died and had the premiums taken out of the proceeds, or who repaid the premiums which were in default and kept their policies in effect after separation from service, would be discriminated against, because they would have had to pay for their insurance protection while in the service while servicemen in the position of the defendants in the present case would have had free insurance at Government expense.

Certain of the legislative history of the 1940 Act which was not cited by any of the parties to this action throws some light on what was the Congressional intent with respect to the insured's duty to repay the Government for premiums paid on his insurance.

The following is an excerpt from the discussion of H.R. 10338, 76th Cong., 3d Sess. (which later became the Soldiers' and Sailors' Civil Relief Act of 1940), on the floor of the House of Representatives on October 3, 1940, 86 Cong. Rec., Part 12, pp. 13,132–13,133 (italics supplied):

"Mr. Voorhis. In the case of insurance I understand that the Government guarantees the difference between the amount of premium that the man can pay and the full amount of the premium, *but that the man must repay the Government for the amount that the Government pays on his behalf during this period at some future time.* In other words, I think we should not give the impression that this is a moratorium on payments of various sorts. It is not. It is a suspension of action

against men who are put into service, which may affect these instruments of theirs, and in effect a postponement of payment to such time, if the court decides it is fair to do it, as they are able to pay. As I understand it, such action on the part of the court is permissive and not mandatory; that the court may grant this relief. It does not have to grant it. If I am wrong about any of these remarks, I want to be corrected now. I am only a layman. I am not a lawyer and I have not been on the committee, but I just made these remarks because I think it is a very important bill to many thousands of people and that Members of Congress ought to consider it carefully and that we ought to be clear in our minds as to what we are doing.

"Mr. Van Zandt. Mr. Speaker will the gentleman yield?

"Mr. Voorhis of California. I yield.

"Mr. Van Zandt. Did I understand the gentleman to say that where a person has an insurance policy and is unable to meet the payments, the Government will assume that responsibility?

"Mr. Voorhis of California. Perhaps the chairman of the committee had better answer it, but my understanding is that the Government pays the difference between the amount a man is considered able to pay and the full amount of the premium, while he is in the service.

"Mr. Arends. Will the gentleman yield?

"Mr. Voorhis of California. I yield.

"Mr. Arends. The gentleman is correct. However, he will be issued a certificate *and he will have to pay this back*. In other words, the Government will have a lien against this man's insurance policy *until such time as the owner of the insurance policy reimburses the Government*.

"Mr. Voorhis of California. *And how long does he have to pay it back? A year?*

"Mr. Arends. *A year after he is out of service.*

"Mr. Voorhis of California. *And during that year he must repay the Government what it has paid on his policy?*

"Mr. Arends. *That is correct."*

The Court notes with respect to the above that Representative Leslie Arends of Illinois was a member of the House Committee on Military Affairs, which committee had been studying the bill. He was subsequently appointed to be a "Manager on the part of the House" in the conference with Senate conferees with respect to the bill.

In House Report No. 2198, 77th Cong., 2d Sess., which was the report of the House Committee on Military Affairs on H.R. 7164, which bill with some changes became the 1942 Amendment to the Soldiers' and Sailors' Civil Relief Act of 1940 (excerpts from which report appear at 50 U.S.C.A.Appendix, Vol. 1, pp. 499–505), there appears the following statement (italics supplied):

"A method is also prescribed whereby a person who has availed himself of the benefits of article IV may *repay the premiums* guaranteed by the Government over a period of 3 years subsequent to the period of military service, *instead of within 1 year as now provided."*

The plaintiff calls attention to the fact that the National Service Life Insurance Act of October 8, 1940, c. 757, Title VI, Part I, §§ 601–618, 54 Stat. 1008–1014, which appears as 38 U.S.C.A. §§ 801–818, was passed nine days prior to the Soldiers' and Sailors' Civil Relief Act of 1940. The National Service Life Insurance Act provided a system of Government life insurance for men in military service of the United States. That Act did not provide free insurance. Servicemen who applied for insurance under that Act were granted insurance upon payment of premiums. See 38 U.S.C.A. § 802(a, m). Premiums were waived during continuous total disability of the insured. 38 U.S.C.A. § 802(n). There was an exception to the necessity of payment of premiums under 38 U.S.C.A. § 802(d)

which provided, in substance, that persons in active service on or before October 8, 1940, who died without applying for National Service Life Insurance prior to 120 days after December 20, 1941, were deemed to have such insurance, and that persons who became totally disabled during such period could, without having applied for insurance under the Act, get waiver of premium benefits. In 38 U.S.C.A. § 802 (d)(4), Congress explained why such gratuitous insurance benefits were being provided, as follows (italics supplied):

"The benefits and privileges extended by this section are hereby so extended by the Congress because many of the personnel of our armed forces (1) were unable to comply with the prerequisites necessary to the granting of insurance by reason of extended duty in the North Atlantic, Hawaii, the Philippines, and other outlying bases; (2) had failed or neglected to apply for such insurance in the expectation that their service would be peacetime service only; and (3) by reason of the suddenness with which war was thrust upon us, had not sufficient time to apply for such insurance prior to engaging in combat. *The Congress hereby declares that no further relief of such character will be granted."*

Reference was made by the parties to the Soldiers' and Sailors' Civil Relief Act of 1918. That Act was the Act of March 8, 1918, c. 20, 40 Stat. 440–449, formerly appearing as 50 U.S.C.A.Appendix, §§ 101–165. The insurance provisions of that Act were substantially identical to those of the 1940 Act. In Administrator's Decision No. 742, promulgated April 1, 1947, heretofore referred to, reference was made to the administrative experience under the 1918 Act, as follows:

"In the administration of the 1918 Act the ultimate net loss to the Government, as shown by the Annual Report of the Director, United States Veterans Bureau for the fiscal year ending June 30, 1924, p. 445, was $19,518.40. The precise extent of the Government's efforts to collect from insureds who permitted their insurance to lapse under conditions requiring the Government to pay to insurers the difference between the premiums with interest and the cash surrender value of the insurance is not known, but it is clear that, in the administration of the 1918 Act, collections were effected in some cases. A list of at least 14 such cases is presently at hand. They reflect collections during the years 1923–24, and one such collection was made as late as October 8, 1925. For present purposes the amount of such collections and the extent to which efforts were made to effectuate them are matters of no importance. The significant thing is that they negative any idea or assertion that an administrative practice prevailed not to regard the insured as indebted to the United States."

As heretofore noted, the Government guaranteed over $360,000 in insurance premiums under the 1918 Act. The relatively small loss sustained thereby would seem to indicate that the construction placed on that Act by those administering it and those applying for its benefits was that the Government was not to bear the expense of such guaranteed premiums.

The silence of the 1940 Act on the subject of reimbursement justifies reference to matters outside the Act which might tend to indicate what the Congressional intent was on that point. The various statements and materials furnished by the Veterans' Administration are helpful only to the extent that they tend to reveal the intent of Congress. The defendants do not contend that anything said or done by the Veterans' Administration works an estoppel against the Government. The Veterans' Administration at first took an equivocal position when the question as to the necessity of reimbursement was put to it. The reply was that the Act did not provide for reimbursement. The Veterans' Administration did not say that there was no necessity to reimburse the United States.

The question was again put to the Veterans' Administration in 1943, and the answer then, in Administrator's Decision No. 513, was clearly that the premiums must be repaid. If the position of the Veterans' Administration prior to the promulgation of Administrator's Decision No. 513 be considered to be an administrative interpretation of the 1940 Act favorable to the position taken by the defendants in these cases, it should be noted that the Veterans' Administration, over a longer period of time than elapsed prior to Administrator's Decision No. 513, has taken a contrary position. The administrative interpretation of the Act having thus changed, the Court is of the view that it is not of controlling significance.

■ The fact that express provision for reimbursement was made in the 1942 Amendment does not compel the conclusion that there was no such duty prior to that time. In the recent case of Johansen v. United States, 1952, 72 S.Ct. 849, the United States Supreme Court considered the effect of an amendment to the Federal Employees' Compensation Act of 1916, 39 Stat. 742, 5 U.S.C.A. § 751 et seq. The original Act contained no express provision as to whether the remedy afforded the employees coming within the scope thereof was exclusive of other remedies. Following the enactment of the Act there was a divergence in the court holdings as to the exclusiveness of the remedy provided by the Act. In 1949 Congress amended the Act and added the following provision:

"The liability of the United States * * * under this Act * * * with respect to the injury or death of an employee shall be exclusive, and in place, of all other liability of the United States * * *."

Two employees who had sustained injuries prior to the 1949 amendment sought recovery for such injuries under the provisions of the Public Vessels Act of 1925, 43 Stat. 1112, 46 U.S.C.A. § 781 et seq. They contended that the fact that Congress amended the Federal Employees' Compensation Act so as to expressly provide that the remedy afforded employees under the Act was exclusive indicated that Congress at the time it enacted the original Act did not intend that the remedy afforded by the Act should be exclusive. The Court rejected that contention and held that the effect of the amendment was merely to make clear and definite what had always been the law under the Act, i. e., that the remedy afforded by the Act was exclusive. The case is illustrative of the rule that the fact that a provision of law is expressed and made definite in an amendment to a statute does not compel the conclusion that the prior statute had been changed in that particular or that the same legal relations did not exist under the previous statute. Cf. Girard Investment Company v. Commissioner, 3 Cir., 1941, 122 F.2d 843, 846.

■■ It is a well settled principle of law that one who guarantees the debt of another and, pursuant to his promise, pays such debt is entitled to reimbursement for such payment from the principal debtor even though there is no express provision for reimbursement. See, e. g., Howell v. Commissioner, 8 Cir., 1934, 69 F.2d 447, 450, and cases cited therein; 38 C.J.S., Guaranty, § 111. The differences between contracts of suretyship, guaranty, and indemnity are discussed in the Howell case. See also, 38 C.J.S., Guaranty, §§ 5 and 6. As pointed out in the Howell case, there is ordinarily no duty of reimbursement in the case of a contract of indemnity—that is, in a case where A, without the knowledge or request of B, promises to hold C harmless for any loss sustained from C's dealings with B. In such a case B ordinarily has no duty to reimburse A because A acted merely as a volunteer and there was no privity of contract or assumption of legal relations between A and B. It is obvious in the present cases that the "contract" between the United States and the insurance companies was not one of indemnity. It would appear that the contract was one of guaranty rather than of suretyship, although the distinction is immaterial so far as the matter of reimbursement is concerned. Certificates were to be issued to the insurers only with respect

to defaulted premiums, were to be held as security, and were to be paid only if the policy finally lapsed due to premiums being in default. In other words, the United States was to pay the defaulted premiums only if the insured persons did not. The United States was not, then, originally and primarily responsible to pay such premiums, but was only secondarily liable for their payment under a contract with the insurer which was collateral to the contract between the insured and the insurer. The United States entered into such contract with the insurers of these defendants pursuant to their requests. By virtue of their requests to the United States, that it prevent their insurance policies from lapsing by guaranteeing the premiums thereon, these defendants entered into jural relations with the United States.

It is the contention of the defendants that the principle of reimbursement is not applicable herein because they owed no "debts" with respect to their life insurance premiums, because an insured always has the option of not paying his premium and letting his policy lapse. It is to be noted, however, that the applications for benefits under the Soldiers' and Sailors' Civil Relief Act of 1940 signed by each of these defendants were made to their insurance companies. These defendants, in effect, asked those companies to extend life insurance protection to them, even though they might not be able to pay premiums while in military service, on the strength of the Government's promise to pay any premiums in default. The insurance companies, pursuant to such request and such guarantee, did in fact extend insurance protection to these defendants during their military service and for a period thereafter. Insurance protection has real and recognized value. The defendants did receive the benefit of such protection because of the guarantee by the United States. Moreover, the fact that a guarantee which a guarantor makes is as to a debt which is to be incurred in the future does not defeat the guarantor's right to reimbursement, when such debt is actually subsequently incurred by the principal debtor and payment is made by the guarantor. It would seem that the common law duty to reimburse a guarantor who has paid one's debt would impose liability on these defendants unless a Congressional intent to the contrary underlay the 1940 Act.

The mere fact that certain means of reimbursement were provided for under the 1940 Act, i. e., the claim of the United States against the cash surrender value or the proceeds, does not necessarily imply that common law principles of reimbursement to a guarantor should not apply. The insurance provisions of the 1940 Act relating to the Government's lien and to accounting and settlement are concerned with defining the relations between the United States and the insurance companies. An intent is evinced that the insurance companies shall not pay out any monies to the insured persons until the United States has been reimbursed for expenditures made in their behalf. It would seem that the restraints thus placed upon the insurance companies could hardly be considered as in any way affecting the relationship existing between the United States and the insured persons. Neither can the consent given by the applicant to such protection to the United States constitute an express contract between the United States and the applicant which negates the implied agreement of indemnity. It is merely his consent to a remedy about which there might otherwise be some difficulty with respect to procedure or with respect to exemption statutes. The fact that such provisions were included in the statute does tend to indicate that there was no intent on the part of Congress to provide gratuitous insurance.

The portion of the Congressional Record of October 3d, 1940, in which Representative Voorhis and Representative Arends state clearly and repeatedly that the insured person does have to repay the United States for premiums paid on his insurance certainly belies any inference that Congress meant that common law principles of indemnity of guarantors should not apply. Representative Arends was a member of the committee which studied the bill, and was apparently in as

good a position as anyone could be to state what the bill was intended to do and upon whom the ultimate liability for insurance premiums was intended to rest. Committee reports and explanatory statements by committee members are entitled to weight in interpreting ambiguous statutes. United States ex rel. Chapman v. Federal Power Commission, 4 Cir., 1941, 191 F.2d 796, 802. See also, Jones, Extrinsic Aids in the Federal Courts, 25 Iowa Law Review 737, 743–750 (1940); 50 Am.Jur., Statutes, § 335. In an article by Rankin M. Gibson entitled "Congressional Concurrent Resolutions: An Aid To Statutory Interpretation?" 37 American Bar Association Journal 421 (June 1951), it is stated (at p. 482):

"Logically the events occurring immediately prior to the enactment afford the most lucrative source of information indicative of the legislative intention. Consequently history of the measure from the time of its introduction in the Congress to its enactment has generally been the first extrinsic aid utilized. This history has included, among other things, committee reports, certain statements made at committee hearings and by the member of the committee in charge of the bill 'on the floor', and messages of the President. It will be observed that in timing, these events occurred before the enactment date of the legislation being interpreted. When expressions of legislative intention are made subsequent to the enactment date, however, an altogether different question is presented."

The author then points out the reluctance of the courts to give determinative weight to declarations of Congressional intent made subsequent to the passage of an Act.

 The setting and circumstances under which the Soldiers' and Sailors' Civil Relief Act of 1940 was passed would seem to be of importance. If the insurance premiums paid by the United States did not have the status claimed for them by the plaintiff, the result would have been that a group of servicemen would have been furnished free insurance protection by the United States with commercial insurance companies. In that connection the plaintiff points out that nine days prior to the passage of the Soldiers' and Sailors' Civil Relief Act of 1940 Congress had passed the National Service Life Insurance Act. Except in certain limited instances, servicemen insured under the provisions of that Act had to pay the United States for their insurance protection. The plaintiff claims that it is incredible that Congress, after passing the National Service Life Insurance Act requiring servicemen to pay the United States for their insurance protection, would nine days later turn around and provide a certain group of servicemen with what in substance would be free insurance protection with commercial insurance companies, with higher premium rates. It is the view of the Court that the setting and circumstances referred to tend to support the claim of the plaintiff as to Congressional intent.

It should be noted parenthetically that in the Servicemen's Indemnity Act of 1951, 38 U.S.C.A. §§ 851–858, Congress provided free insurance for those in military service by setting up a system of Government protection which does not involve the purchase of insurance protection from commercial insurance companies.

 It appears that these defendants, and others similarly situated, who thought they would secure free life insurance at Government expense, were the victims of high pressure salesmanship which followed in the wake of some equivocal statements by the Veterans' Administration on the subject of reimbursement. The belief that the insurance was free is understandable in view of the sort of answers that the Veterans' Administration made to the direct questions which were put to it. It appears that the practice of selling life insurance to men about to enter military service on the representation that it was free after payment of the first premium was rather widespread. See article in the January 31, 1941, issue of The Eastern Underwriter, heretofore referred to. It was reported in that issue of The Eastern Underwriter that one Iowa insurance salesman wrote $5,000 policies on each of 300 National Guardsmen about to be called to active duty, earning $10,000 in five days for himself as com-

missions. It should be stated, however, as reported in The Eastern Underwriter, that insurance companies generally condemned such practice. For a description of the way in which such selling occurred, see Berenbeim v. United States, 10 Cir., 1947, 164 F.2d 679, certiorari denied, 333 U.S. 827, 68 S.Ct. 454, 92 L.Ed. 1113. However, those factors do not change the legal situation with respect to the duty of these defendants to indemnify the United States. These defendants applied for protection of their insurance policies under the 1940 Act. As a result of the action of the United States in guaranteeing the payment of their defaulted premiums they received insurance protection while in the military service and for a period thereafter. Such insurance protection was a benefit received by them for which they owed the insurance companies which had provided such insurance protection. The United States was required to pay their debts to such insurance companies. Under common law principles the United States would be entitled to reimbursement. The Court is of the view that neither the provisions of the Soldiers' and Sailors' Civil Relief Act of 1940 nor its legislative history are indicative of a Congressional intent to abrogate the common law right of the United States to reimbursement.

It is the holding of the Court that the United States is entitled to reimbursement from the defendants in these cases.

Judgment will be entered in favor of the plaintiff in each case.