**UNITED STATES of America, Appellant,**

v.

**Irwin Pincy HENDLER, Appellee.**

**No. 5060.**

United States Court of Appeals
Tenth Circuit.

July 26, 1955.

Lester Jayson, Attorney, Department of Justice, Washington, D. C. (Warren E. Burger, Asst. Atty. Gen., Donald E. Kelley, U. S. Atty., Denver, Colo., Samuel D. Slade, Attorney, Department of

Justice, David A. Turner, Associate General Counsel and David C. Byrd, Attorney, Veterans' Administration, Washington, D. C., on the brief), for appellant.

Gordon Slatkin, Denver, Colo. (Joseph Mosko, Denver, Colo., on the brief), for appellee.

Before BRATTON, HUXMAN and PICKETT, Circuit Judges.

HUXMAN, Circuit Judge.

This is an appeal from an order of the United States District Court for the District of Colorado, sustaining defendant's motion to dismiss the Government's complaint for failure to state a cause of action. The sole question presented for determination is whether the United States is entitled to recover reimbursement from an individual previously in the military service for premiums guaranteed and paid on a policy of life insurance, pursuant to the provisions of Article IV of the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C.A. Appendix § 501 et seq. (1940 Ed.).[1]

The United States in its complaint against the defendant, Irwin Pincy Hendler, appellee herein, alleged in substance that prior to entering the military service the defendant had a contract of insurance covering his life; that he made application for the benefits and protection provided for in Article IV; that the application was duly approved by the Administrator of Veterans' Affairs; that the insured failed within two years after termination of his military service to pay the premiums becoming due upon the policy and not paid during such period of military service; that in accordance with the provisions of Article IV the United States paid to the insurer the amount of such premiums; and that there was due from the defendant to the United States the amount so paid together with interest, for which judgment was prayed. The district court sustained the motion to dismiss the action on the ground that the complaint failed to state a claim upon which relief could be granted.[2]

1. The pertinent provisions of the 1940 Act provided:

"Sec. 409. In the event that the military service of any person being the holder of a policy receiving the benefits of this article shall be terminated by death, the amount of any unpaid premiums, with interest at the rate provided for in the policy for policy loans, shall be deducted from the proceeds of the policy and shall be included in the next monthly report of the insurer as premiums paid.

"Sec. 410. If the insured does not within one year after the termination of his period of military service pay to the insurer all past due premiums with interest thereon from their several due dates at the rate provided in the policy for policy loans, the policy shall at the end of such year immediately lapse and become void, and the insurer shall thereupon become liable to pay the cash surrender value thereof, if any: Provided, That if the insured is in the military service when this Act ceases to be in force, such lapse shall occur and surrender value be payable at the expiration of one year after the date when this Act ceases to be in force.

"Sec. 411. At the expiration of one year after the date when this Act ceases to be in force there shall be an account stated between each insurer and the United States, in which there shall be credited to the insurer the total amount of the certificates held as security under this article, together with accrued interest to the date of the account, and in which there shall be credited to the United States the amount of the cash surrender value of each policy lapsed or forfeited as provided in section 410, but not in any case a greater amount on any policy than the total of the unpaid premiums with interest thereon at the rate provided for in the policy for policy loans.

"Sec. 412. The balance in favor of the insurer in each case shall be certified by the Administrator of Veterans' Affairs to the Secretary of the Treasury, who shall pay to the insurer the amount thereof, which is hereby authorized to be appropriated, out of any moneys in the Treasury not otherwise appropriated, upon the surrender by the insured of the certificates delivered to it from time to time by the Administrator of Veterans' Affairs under the provisions of this article." 50 U.S.C.A.Appendix, §§ 549–554 note.

2. See 123 F.Supp. 383.

The pertinent sections of Article IV of the 1940 Act, under which this controversy arose, did not in express language make a serviceman receiving the benefits thereof personally liable for insurance premiums guaranteed and subsequently paid by the Government. Section 408, 50 U.S.C.A.Appendix, § 548 note gives the Government a lien on the policy to indemnify it against loss because of its guarantee of the suspended premium payments. Section 409 provides that in the event the military service of any person having obtained the benefit of the Act shall be terminated by death, the amount of any unpaid premiums with interest shall be deducted from the proceeds of the policy and included in the next monthly report of the insurer as premiums paid. Section 410 in part states that if the insured shall not within one year after the termination of his period of military service pay to the insurer all past due premiums with interest thereon the policy shall at the end of such year immediately lapse and become void, and the insurer shall thereupon become liable to pay the cash surrender value thereof. Section 411 provides that at the expiration of one year after the date when the Act ceases to be in force there shall be an account stated between each insurer and the United States, in which there shall be credited to the insurer the total amount of the certificates held as security together with interest thereon, and in which there shall be credited to the United States the amount of the cash surrender value of each policy lapsed or forfeited, as provided for in Section 410, but not in any case a greater amount on any policy than the total of the unpaid premiums with interest. Section 412 provides that if at the final accounting period a sum remains due the insurer such sum shall be certified by the Administrator of Veterans' Affairs to the Secretary of the Treasury, by whom the account so certified shall be paid.

Thus under the Act there are two specific methods of reimbursement for money expended by the Government for insurance premiums for servicemen who apply for the benefits of the Act. These are (1) payment out of the proceeds of policies that have matured, and (2) payment out of the accumulated cash surrender value of policies that have terminated under the Act. The question for our consideration is did Congress in the passage of the Act intend also to give the Government a personal cause of action against a surviving serviceman for sums paid in excess of the reserve value of the policy?

We think it is clear that the Government does not become primarily liable for the payment of premiums on insurance policies of servicemen who took advantage of the benefits of the Act. It is only a guarantor, guaranteeing payment thereof. It merely guarantees payment of such premiums as are not paid by policyholders who have come under the Act. It is well settled in the law that one who guarantees a debt of another and is required to pay the same is entitled to reimbursement from the principal debtor. This principle is so well settled that no citation of authority is necessary. Since the contract between the Government and the serviceman arising from the Act is one of guaranty, it must follow that the Government is entitled to reimbursement unless the Act itself compels a contrary conclusion. Whether the Act of 1940 contemplated that the Government was entitled to reimbursement is the crux of this case.

It must be conceded that the Act of 1940 does not provide for personal liability of the insured serviceman in specific terms. The Act has been considered by a number of courts.[3] In all

3. United States v. Nichols, D.C.N.D.Iowa 1952, 105 F.Supp. 543; appeal dismissed Boller v. United States, 8 Cir., 1953, 202 F.2d 956; Morton v. United States, D.C.E.D.N.Y.1953, 113 F.Supp. 496; Plesha v. United States, D.C.N.D. Cal.1953, 123 F.Supp. 593; Hormel v. United States, D.C.S.D.N.Y.1954, 123 F. Supp. 806.

of them it has been treated as being ambiguous and subject to judicial construction. It is appellee's position that since the Act provides two definite ways of reimbursement and does not specifically provide for personal liability, by implication it limits the rights of recovery to the two methods provided therein and excludes any other method of recoupment. This argument comes with considerable force. We feel, however, that when the Act of 1940 and the Act of 1918, upon whch it is predicated, are considered against the legislative background of the objects sought to be accomplished, a contrary conclusion is required.

▇ The first question concerns what material we look to in seeking legislative intent. Appellee contends that we must confine ourselves to committee reports and not consider congressional debates and hearings. With this we cannot agree, notwithstanding what is said in Lapina v. Williams, 1914, 232 U.S. 78, 90, 34 S.Ct. 196, 58 L.Ed. 515, and Duplex Printing Press Company v. Deering, 1921, 254 U.S. 443, 474–475, 41 S.Ct. 172, 65 L.Ed. 349. An examination of the later decisions of the Supreme Court warrants the statement that a court may go beyond committee reports to ascertain legislative intent. In the Supreme Court decisions already handed down in 1955 which are set out in footnote 4,[4] the Supreme Court refers to and, to some extent at least, relies upon Congressional debates and upon statements made at hearings. Nor can it be said that the Supreme Court has not considered the problem. In two recent decisions the late Mr. Justice Jackson wrote strong concurring opinions admonishing the majority for its extensive use of material more remote than committee reports.[5] The reasons for the more liberal rule are well stated by Mr. Justice Frankfurter in United States v. Universal C. I. T. Credit Corp., 344 U.S. 218, 221, 73 S.Ct. 227, 229, 97 L.Ed. 260, as follows: "Generalities about statutory construction help us little. They are not rules of law but merely axioms of experience. Boston Sand Co. v. United States, 278 U.S. 41, 48, 49 S.Ct. 52, 73 L.Ed. 170. They do not solve the special difficulties in construing a particular statute. The variables render every problem of statutory construction unique. See United States v. Jin Fuey Moy, 241 U.S. 394, 402, 36 S.Ct. 658, 659, 60 L.Ed. 1061. For that reason we may utilize, in construing a statute not unambiguous, all the light relevantly shed upon the words and the clause and the statute that express the purpose of Congress. Very early Chief Justice Marshall told us, 'Where the mind labours to discover the design of the legislature, it seizes everything from which aid can be derived * * *.' United States v. Fisher, 2 Cranch 358, 386, 2 L.Ed. 304."

The first Soldiers' and Sailors' Civil Relief Act was passed in 1918. 40 Stat. 440. Since the Act of 1940 was a substantial reenactment of the Act of 1918 the history of that Act would seem pertinent. With respect to the provisions on reimbursement of the Government the two Acts are virtually identical. The subsequent legislation in 1942, concerning the right of recovery, and its legislative history is admissible to determine what Congress thought in 1940. See Great Northern Railway Co. v. United States, 1942, 315 U.S. 262, 277, 62 S.Ct. 529, 86 L.Ed. 836.

Most of the information of value concerning the 1918 Enactment is found in

---

4. Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 75 S.Ct. 313; Wilburn Boat Co. v. Firemans' Fund Ins. Co., 348 U.S. 310, 75 S.Ct. 368; United States v. Bramblett, 348 U.S. 503, 75 S.Ct. 504; United States v. Menasche, 348 U.S. 528, 75 S.Ct. 513; Granville-Smith v. Granville-Smith, 349 U.S. 1, 75 S.Ct. 553; Shaughnessy v. Pedreiro, 349 U.S. 48, 75 S.Ct. 591; Maneja v. Waialua Agr. Co., 349 U.S. 254, 75 S.Ct. 719; Marcello v. Bonds, 75 S.Ct. 757.

5. See Schwegmann Bros. v. Calvert Distillers Corp., 1951, 341 U.S. 384, 395, 71 S.Ct. 745, 95 L.Ed. 1035; United States v. Public Utilities Comm., 1953, 345 U.S. 295, 319, 73 S.Ct. 706, 97 L.Ed. 1020.

the hearings and the proposed bill which did not pass. The original bill purported to suspend or postpone the proceedings against servicemen for the duration of the war. It provided that defaulted insurance premiums would be charged to the policy as a loan and paid by the insured with interest at any time within six months after termination of the insured's military service. The insurance companies objected, asserting that it would compel the insurance companies to maintain policies in force despite nonpayment of premiums, contrary to the terms of the insurance contract; that in reality the serviceman was being given an option to pay or not to pay his defaulted premiums, as he saw fit, upon his return from the war because the bill failed to provide a consensual enforcible obligation with reference to premiums accruing in the future. To meet this objection, Dean Wigmore then serving as an officer in the Office of the Judge Advocate General suggested a guaranty by the Government that the premiums be paid. This suggestion was adopted and a bill emerged and was passed. In its reimbursement aspects it was identical to the Act of 1940. The Congressional Record contains nothing helpful on the 1918 Act except what may be deduced as an intention from general statements that the act was to "suspend enforcement of certain civil liabilities" and that the insurance provisions "guaranteed" payment by the serviceman. The only committee report of value is H.R.Rep. No. 181, 64th Cong. 1st Sess. 7–9 (1917). It was there pointed out that this bill covered a field entirely separate from the insurance provisions of the War Risk Insurance Bill. It was pointed out that under this bill all the Government did was to guarantee the payment of the premiums. It was reported that "If the soldier dies, the insurance company will get its premiums out of the policy and the Government's guaranty will not be called upon. If the soldier comes back from the war he will repay the premiums if he continues the policy, and if he lets the policy lapse, the Government will be subrogated to his rights." The statements contained in this report are not too helpful. They can be construed that the Government only guarantees the payments and thus indicate a right of action in the Government for the excess, but there are other provisions which would indicate the contrary.

The legislative history of the 1940 Act, with one notable exception, is also equivocal. The first proposals to reenact the Soldiers' and Sailors' Civil Relief Act left out the provisions in reference to taxes and insurance because the sponsor believed them inapplicable to the 1940 situation.[6] Later, a bill was submitted and adopted which did contain the insurance features. The committee reports which accompanied the bills stated generally that their purpose was to "suspend enforcement of certain civil liabilities" and that it contemplated "suspension of the lapsing of insurance for default in payment of premiums."[7] In direct reference to life insurance provisions, both reports stated that upon application by persons in the military service the Administrator of Veterans' Affairs might guarantee the payment of premiums in order to prevent lapsing or forfeiture of such policies; that such persons might within one year after leaving the military service pay up premiums paid by them and resume payment of regular premiums; that if they did not do so the policy lapsed and the cash surrender value accrued to the Government to the extent necessary to meet the cost of the premiums which it had guaranteed.

On the Senate floor there was little debate. All that was said was general talk of suspension of enforcement and of the Government's guarantee.[8] In the House of Representatives Mr. Voorhis of California in speaking upon the bill

---

6. 86 Cong.Rec. 10052.

7. H.R.Rep. No. 3001, 76th Cong., 3d Sess. 1–2 (1940); Sen.Rep. No. 2109, 76th Cong., 3d Sess. 1–2 (1940).

8. See 86 Cong.Rec. 12835.

stated that he would try to interpret the bill as he understood it and stated that in the case of insurance he understood that the Government guaranteed the difference between the amount of premiums that the man can pay and the full amount of the premiums, but that the man must repay the Government at some future time for the amount that the Government pays on his behalf during this period. He stated that if he was wrong about this interpretation he wanted to be corrected. In response, Mr. Arends, a member of the committee, replied that Voorhis' interpretation of the bill was correct. He stated that the insured would be issued a certificate and that he would have to pay this back. "In other words, the Government will have a lien against this man's insurance policy until such time as the owner of the insurance policy reimburses the Government." In response to a question by Voorhis as to the time the serviceman had to repay Mr. Arends replied, "A year after he is out of service." To which Mr. Voorhis replied as follows: "And during that year he must repay the Government what it has paid on this policy." Mr. Arends replied, "That is correct." [9] While Mr. Arends was not the chairman of the Military Affairs Committee, he was a member of that committee and was conference manager on the part of the House when the bill was sent to the conference to iron out Senate and House differences. His reassurances as to the meaning of this bill when directly called into issue when the bill was up for consideration would seem to carry considerable weight.

The 1942 Amendments to the Civil Relief Act specifically provided for personal liability for any sum paid by the Government under its guarantee.[10] The explicit liability as it now appears in the law was incorporated in the Senate Bill accompanying Sen.Rep. No. 716, 77th Cong. 1st Sess. (1941), where it was stated, "The proposed Amendment has been drafted in accordance with the suggestions of the Veterans' Administration for the purpose of clarification and will not effect any substantial change in the basic purposes of the bill." (Id. at p. 3.) It was not until the next session that a similar bill came before the House Committee. At the hearings before the House Committee the following is the substance of what was said.[11] In response to a question by the chairman as to the payment on premiums on such policies, it was stated by a representative of the Veterans Administration that the insured was liable for all the premiums of the $5,000 policy, the Government acting really as guarantor. However, if there is a default, there would be no liability for the whole amount in excess of the cash value, under the present construction of existing law. There was no registered reaction on the part of the committee members to this response, but it is perhaps significant that shortly thereafter Representative Sparkman stated that the members should understand this, "That the soldier is not relieved from the liability of paying premiums. The Government simply guaranteed that they will be paid." The bill that was reported and passed by the House of Representatives did not contain the express liability provision in the Senate bill and no comment was made in the House relative to the omission of that change.[12] In this session the Senate repassed the same bill which it had passed in the preceding session containing express liability payment provisions and containing the same comments that changes were to clarify existing law. Because of the differences between the House and Senate versions of the amendments, a conference committee was appointed. The conference committee retained the Senate provision concerning

---

9. 86 Cong.Rec. 13132–33 (1940).

10. 56 Stat. 769, 775, 50 U.S.C.A.Appendix, § 546.

11. Hearings before the House Committee on Military Affairs on H.R. 7029, 77th Cong. 2d Sess. 38, 40 (1942).

12. See H.R.Rep. No. 2198, 77th Cong. 2d Sess. (1942).

the liability on the guaranteed payments. The only reference in the report concerning this was as follows: "Under the House bill, any amounts paid by the United States to an insurer on account of approved applications do not become a claim against the owner of the policy. The Senate amendment (sec. 406) made such payments a debt due to the United States and authorized collection by deduction from any future amounts due the insured by the United States. The conference agreement retains the Senate provision." [13] Then reporting to the House, Representative Sparkman made this comment: "The three points on which the House yielded did not substantially change the bill. * * * Under the House Bill nothing was said about these amounts being claims against the person in the armed forces after he got out of the service. The Senate provides that they shall be a claim against him and shall be collected against any amounts that may become due him by the United States. The House accepted the Senate provision." [14]

An examination of the legislative history of the 1942 Amendments thus indicates that the Senate did not think that it was changing the 1940 law by the enactment of this provision. The statement by Representative Voorhis, concurred in by a member of the House Committee, when the 1940 Act was under consideration also indicates that the House construed the 1940 Act as imposing personal liability.

A number of district courts have considered this question. In an exhaustive and well reasoned opinion, the trial court in United States v. Nichols, D.C.N.D. Iowa 1952, 105 F.Supp. 543, reached the conclusion that the 1940 Act imposed personal liability and that the 1942 Amendment worked no substantial change therein.[15] The trial court in this case felt that the decision of the

Supreme Court in Gilman v. United States, 1954, 347 U.S. 507, 74 S.Ct. 695, 98 L.Ed. 898, where it was held that the United States was not entitled to recover from one of its employees for whose negligence it was held liable under the Federal Tort Claims Act, 28 U.S. C.A. §§ 1346, 2671 et seq., controlled the decision in this case. But we think that case is clearly distinguishable. The Federal Tort Claims Act was not passed for the benefit of Government employees. It conferred no benefits upon them. It did not relieve them of personal liability for their negligent acts. It was passed solely for the purpose of giving the aggrieved person a cause of action against the Government, the principal, which did not exist because of the Government's immunity to suit without its consent. That Act did not purport to establish the relation between the Government, the employer, and its negligent employees by the passage of the Act. Furthermore the Supreme Court found that the legislative history of that Act supported the conclusion that no right to a cause of action against the negligent employee was contemplated. Also the court placed strong reliance upon considerations of employee morale and the general employer-employee relationship between the Government and its vast army of employees, relationships which are not present in the case at bar.

■■ Here we are dealing with the Government and its military servicemen in times of war, for whom it already had made provision for cheap life insurance before the passage of this Act. In this Act it was not concerned primarily with affording servicemen additional insurance. Its main concern was with the protection of their vested private rights. It intended to protect those rights by suspending the right to enforce legal obligations such as breach of contract resulting because of military service, and

---

13. H.R.Rep. No. 2481, 77th Cong., 2d Sess. 6 (1942).

14. 88 Cong.Rec. 7545.

15. For similar holdings see Morton v. United States, D.C., E.D.N.Y.1953, 113 F.Supp. 496; Plesha v. United States, D.C.N.D.Cal.1953, 123 F.Supp. 593; for a contrary holding see Hormel v. United States, D.C.S.D.N.Y.1954, 123 F.Supp. 806.

yet affording some protection to creditors. For that reason it gave servicemen who had commercial insurance in force the right to come in under the provisions of the Act and prevent the forfeiture of such insurance, because of their inability to make the payments during their time of service, by guaranteeing the premiums during their military service and affording them the opportunity to continue such insurance in force when they returned. Not only do we find nothing in the legislative history indicating that this service was to be a gratuity to servicemen but on the contrary we think that the legislative history, considered against the background of the purpose sought to be accomplished by the passage of the Act, requires the conclusion that the usual rules of guarantyship were intended to apply to servicemen availing themselves of the additional benefits of the Act.

The judgment of the trial court is reversed and the cause is remanded with directions to proceed in conformity with the views expressed herein.

Circuit Judge BRATTON concurs in the result.