277 P.2d 798

**OREGON SHORT LINE RAILROAD COMPANY, a corporation, and Union Pacific Railroad Company, a corporation, Plaintiffs and Respondents,**

**v.**

**MURRAY CITY, a municipal corporation, Defendant and Appellant,**

Statewide Plumbing and Heating Company, Inc., a corporation, Defendant.

No. 8122.

Supreme Court of Utah.

Dec. 10, 1954.

Wendell Day, City Atty., Murray, Fabian, Clendinin, Moffat & Mabey, Salt Lake City, for appellant.

Marvin J. Bertoch, M. J. Bronson, A. U. Miner, Bryan P. Leverich, Howard F. Coray, Salt Lake City, for respondents.

McDONOUGH, Chief Justice.

This is a dispute over the ownership of a strip of land eleven city blocks long and approximately four rods wide within the corporate limits of Murray City. Its arrival in this court has been presaged by a series of quarrels between the railroad and the city, dating at least from 1919, usually occasioned by the city's installation of public improvements and apparently settled in a manner unsatisfactory to both parties. When Murray City began laying sewer pipes along this strip, known as Second West Street, some preliminary negotiations for a contract indemnifying the railroad against damage were entered into but they failed and the railroad brought suit, obtaining a temporary injunction against the city and the present appeal is prosecuted from the subsequent trial. After the issuance of the temporary injunction, the railroad discovered that the projected sewer line would be laid some 17 feet beyond its ballast and would not interfere with its signal system and hence acquiesced in the city's operation. Therefore, the real question to be determined here is the rights of the respective parties in the land.

The lower court held that, by appropriation of the public domain by construction of trackage thereon in 1871 and by warranty deeds obtained within the decade following, the railroad acquired the fee title to a portion of the contested strip approximately 33 feet east of the center of its tracks and 11 feet west of the center. The trial court also found that Murray City holds fee title to land to the west of the tracks because of appropriation and use by the public when that land was in the public domain. Murray City appealed, contending that the entire strip was appropriated as a highway prior to the construction of the railroad and that the railroad tracks ran down the center of the portion so appropriated and that the railroad's deeds were subject to the highway right of way acquired by the public. The railroad cross appealed, contending that the trial court erred in finding that the public acquired a right of way over any portion of the strip while it was public domain and in holding that Murray City had the right to lay sewer lines without permission from the railroad.

▉ Inasmuch as there are several points of law involved on this appeal the facts giving rise to each will be discussed in relation to those points. The first question is whether the railroad *could* acquire property under the Federal Act of 1866 referring to "highways" over public lands, 43 U.S.C.A. § 932, since the Act specifically granting the railroads the right-of-way

over public lands, 43 U.S.C.A. § 934, was not passed until March, 1875, nearly four years after the construction of this railroad.

R.S. § 2477, 43 U.S.C.A. § 932 reads:

"The right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted."

Although there is authority for strict interpretation of the word "highways" as used in this statute, Burlington, K. & S. W. R. Co. v. Johnson, 38 Kan. 142, 16 P. 125; Red River, etc., R. Co. v. Sture, 32 Minn. 95, 20 N.W. 229, it has frequently been held in cases following Flint & P. M. R. Co. v. Gordon, 41 Mich. 420, 2 N.W. 648, that a railroad is a highway within the meaning of the statute. 73 C.J.S., Public Lands, § 168, p. 819; Tennessee & C. R. Co. v. Taylor, 102 Ala. 224, 14 So. 379; Sams v. Port Royal, etc., R. Co., 15 S.C. 484; Verdier v. Port Royal R. Co., 15 S.C. 476; Atchison, T. & S. F. R. Co. v. Richter, 20 N.M. 278, 148 P. 478, L.R.A.1916F, 969.

In Flint & P. M. R. Co. v. Gordon, supra, the Michigan court considers the indications of the intent of Congress taken from historical circumstances as controlling in the construction of the statute. The predecessor of the statute under consideration, enacted in 1852, 10 Stat. 28, specified that a right of way was granted for "all Rail and Plank Roads and Macadamized Turnpikes passing through the Public Lands" for construction completed within 15 years from the date of passage of the statute. This act, the court reasons, was intended to grant the right of way to roads constructed by private companies because the states and territories already had the tacit acquiescence of the United States for construction of public-sponsored highways across the public domain, and it was allowed to expire because Congress deemed it best to make a general provision in the Act of 1866 both to continue the building of these roads by private industry and to give sanction of law to the custom of taking public lands for common wagon roads. In view of the known policy of encouragement of the settlement of the uninhabited lands in the West, the court concludes that the legislative intent in suffering the Act of 1852 to expire and in not providing specifically for railroads again until 1875 could only be explained as an expression that Congress intended the Act of 1866 to cover such private construction:

"As bearing upon the construction of the act of 1866 we may well take notice of the fact that, at the time the United States were seeking to stimulate and encourage the construction of railroads in the newer sections of the country by making large grants of land to the projectors, two motives may be said to have influenced this action: First, the general benefit to the country by encouraging new set-

tlements; second, the general benefit to the interest of the United States, as proprietor of other lands, by giving to such other lands additional market value, and creating increased demand for them. It would certainly be very remarkable if, while thus pursuing a policy of liberal encouragement to railroads, the United States should purposely withhold a favor so unimportant to the government as permission to cross the public domain; a permission, too, almost certain, so far as it had influence, to be beneficial. It would be specially remarkable if, in so withholding this privilege, the United States were, in fact, discriminating against this form of thoroughfare." [41 Mich. 420, 2 N.W. 653.]

■ Inasmuch as the railroad here has acquired warranty deeds from patentees of the land in dispute to all but approximately 758 feet of the area covered by its tracks and appurtenances, whether it *did* take land for right of way purposes under the Act of 1866 is important only as to this small section. Naturally, if Murray City has proven that the public had already accepted the Congressional grant for a highway prior to the time the railroad was built, then the land was segregated from the public domain and the land taken by the railroad in warranty deeds would be subject to the highway. Ball v. Stephens, 68 Cal.App.2d 843, 158 P.2d 207; Leach v. Manhart, 102 Colo. 129, 77 P.2d 652.

Appellant Murray City could produce no direct evidence that there was a public road in existence prior to 1871, the date of the railroad construction, and relied upon inferences arising from this evidence: (1) the 24th District School was built sometime after 1874 east of the railroad track, when the only means of ingress and egress was the street now known as Second West, (2) two witnesses testified that they could remember the road's being used, both east and west of the tracks, as early as 1899, (3) four early deeds from contiguous landowners described among the courses "a county road" (the earliest of these deeds is dated December 16, 1874), (4) one of the four deeds refers to Second West Street as "a four rod street" (however, Second West Street does not extend at the present time as far south as the property conveyed by this deed), (5) an official highway plat of Salt Lake County adopted in 1898, (6) houses have stood beyond the east side of the tracks for as long as the witnesses above mentioned can remember (1899) and (7) dates of patents issued to the land over which the railroad runs cover a period from 1872 to 1875.

■ . It is true that the railroad could not validly claim under the Act of 1866 an acceptance of the Congressional grant of a right of way if that land had been withdrawn from the public domain. When a valid entry has been made by a citizen, that portion of the public land covered by the entry is segregated from the public domain,

is appropriated to the private use of the entryman, and is not included in subsequent grants made by Congress. Holt v. Murphy, 207 U.S. 407, 28 S.Ct. 212, 52 L.Ed. 271; McMichael v. Murphy, 197 U.S. 304, 25 S.Ct. 460, 49 L.Ed. 766; Hastings & D. R. Co. v. Whitney, 132 U.S. 357, 10 S.Ct. 112, 33 L.Ed. 363, Kansas Pac. R. Co. v. Dunmeyer, 113 U.S. 629, 5 S.Ct. 566, 28 L.Ed. 1122. However, the present case does not involve a protest by a patentee or his successor, for, indeed, the railroad here owns by deed the fee title to all but 758 feet of land under its tracks by deed. It is said in Enid & Anadarko R. Co. v. Kephart, 19 Okl. 1, 91 P. 1049, that a railroad company appropriating land for its right of way across land covered by homestead entry is an unlawful trespasser, and obtains no right either in law or equity. However, even assuming that an inference could be drawn that the patentees were in occupation as homesteaders five years prior to receiving their patents (there is nothing in evidence to indicate whether their rights were thus obtained or whether their occupation was for a shorter time under preemption laws), the railroad's right of way is not being here contested by the landowner. Where a company has been permitted, by the owner of land, to take possession of it, for the purposes of its railroad, and to occupy it accordingly, and with the necessary expenditure of money, adapt it to such uses, and the owner has permitted it so to occupy and use it for a long time, the facts are presumptive evidence of an agreement that the company shall have the property upon making proper compensation. Paterson N. & N. Y. R. Co. v. Kamlah, 42 N.J.Eq. 93, 98, 6 A. 444. And, in the absence of evidence to the contrary, taking possession of a right of way and building and operating a transcontinental railroad over it support a legitimate inference of the acquisition of a valid right of way, although the right did not ripen into a conveyance until some time thereafter. Oregon Short Line R. Co. v. City of Caldwell, 39 Idaho 71, 226 P. 175.

It is obvious that the evidence outlined above, though it is some evidence that a public highway existed perhaps as early as 1874, does not prove that the highway was already located when the railroad was built in 1871. As to the deed describing the county road as "a four rod highway," it cannot be taken as conclusive as to the width of the highway for the road section described by it is not now in existence nor is there any evidence that it has at any time existed. Likewise, the evidence is equally persuasive of the theory that the road was superimposed upon the existing railroad right of way as it is of the theory that the railroad was built down the center of the highway.

A question then arises as to what estate the railroad received by accepting the grant of a right of way. Of course, the trial court's findings that the railroad held a fee simple as to that portion of the area included in warranty deeds is correct re-

gardless of the estate granted by the Act of 1866; however, as to the 758 feet, covering which the railroad has no deed, we must determine what rights were given. An analysis is given in 73 C.J.S., Public Lands, § 168(d.), p. 824:

"A railroad, under an act of congress granting lands for right of way and station grounds, etc., acquires only an easement, and not a fee, the right granted being one of use and occupancy only, rather than to the land itself.

\* \* \* \* \* \*

"Prior to the decision in Great Northern Railway Co. v. United States, Mont. [315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836], it was held that the estate acquired was more than a mere easement, and was a base, qualified, or limited fee, giving the right to the exclusive possession and use of the land for the purposes contemplated by the law, with a reversionary interest remaining in the United States, to be conveyed by it to the person to whom the land might be patented, whose rights would be subject to those of the grantee of the right of way and station grounds, and that a railroad company could not dispose of or transfer any part of its right of way in any manner which would sever the right of possession from the franchise to operate and maintain a railroad line thereon.

\* \* \* \* \* \*

"Since the railroad does not own the fee of the right of way, it cannot dedicate or grant any part thereof, nor can the railroad grant any part °of its right of way for private use. Since congress did not intend to impose a barrier that could not be crossed between areas lying on opposite sides of the right of way, crossings of the right of way can be acquired, and other limitations imposed in favor of the public, on the exclusive occupancy of the railroad of its right of way. In view of the fact that the railroad's right of way under this general granting statute is but an easement, the railroad has no right to the underlying oil and minerals, although it may be free to develop them under a lease executed pursuant to a statute."

The case of Great Northern Railway Co. v. United States, 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836, was decided by the Supreme Court of the United States in 1942 and has been regarded as a complete reversal of its former position as evidenced by Rio Grande Western R. Co. v. Stringham, Utah, 239 U.S. 44, 36 S.Ct. 5, 60 L.Ed. 136. It is to be noted that the decision was apparently based upon the interpretation of the wording of the Act of March 3, 1875, which specifically granted a right of way to the railroads, buttressed by evidence of a change in congressional policy towards the railroads occurring in

1871. After 1871 outright grants of public lands to private railroad companies were discontinued because of public sentiment, but in order to encourage development of the West, Congress continued to grant rights of way. In prior cases, the court characterized grants of right of way to specific railroad companies as "a present beneficial easement," Denver & Rio Grande Railway Co. v. Alling, 99 U.S. 463, 25 L.Ed. 438, and "simply as an easement, not a fee," Smith v. Townsend, 148 U.S. 490, 43 S.Ct. 634, 636, 37 L.Ed. 533. Because the Great Northern Railway Co. case was an interpretation of the Act of 1875, rather than the Act of 1866, with which we are here concerned, we recognize that it is not strictly controlling in this instance, but hold that the Act of 1866 was intended likewise to grant merely an easement under the view that grants by the sovereign for which no compensation is made will be strictly construed against the grantee and pass nothing but what is conveyed in clear and explicit language. U. S. v. City and County of San Francisco, Cal., 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050; Dubuque & P. R. Co. v. Litchfield, Iowa, 23 How. 66, 16 L.Ed. 500.

Therefore, until the railroad bought the land from the patentees to this strip, it held nothing more than an easement which,

of course, extended to all the purposes incident to the operation of the railroad. And, as to the 758 feet which it does not own, the railroad still has merely an easement. The judgment of the lower court should be modified in this respect.

The trial court found that Murray City was the owner in fee of the strip to the west of the railroad tracks, as present surfaced and used as Second West Street. There is no need to determine the extent of the railroad's right of way taken under the Federal Act, for whether the highway was located as an acceptance of a grant from the public domain at a location immediately west of the tracks before the railroad received deeds to the fee, or established under state statutes similar to U.C.A.1953, 27–1–2,[1] or obtained by prescription, the estate acquired would be but an easement, with the fee remaining in the abutting landowners. The case of White v. Salt Lake City, Utah, 239 P.2d 210, partially resolved the apparent conflict in our statutes regarding the estate taken by the municipality in holding that, in accordance with U.C.A.1943, 78–5–4, U.C.A.1953, 57–5–4, a statutory dedication by the filing of plats of a subdivision vests a fee title in the municipality or county to the streets shown therein. It is apparent that as to streets so platted the legislature

1. U.C.A.1953, 27–1–2. A highway shall be deemed to have been dedicated and abandoned to the use of the public when it has been continuously used as a public thoroughfare for a period of ten years. R.S. 1898 & C.L.1907, § 1115; C.L.1917, § 2801; R.S.1933 & U.C.A.1943, 36–1–2.

intended to change the common law, but U.C.A.1953, 27–1–7, codifies the common law as regards other streets:

"By taking or accepting land for a highway the public acquires only the right-of-way and incidents necessary to enjoying and maintaining it. A transfer of land bounded by a highway passes the title of the person whose estate is transferred to the middle of the highway."

■ The finding of the lower court that Murray City had a fee title to the strip west of the railroad tracks should be thus modified. As to the land east of the tracks, although there is some evidence of travel from a point three to four hundred yards North of the school located at 6100 South on Second West Street until 1930, the trial court apparently found that there was not sufficient evidence of public user to support the city's assertion that a highway existed there. In addition to the recitations in the old deeds above mentioned, Mayor Hansen testified that within his recollection the school children used to walk down the railroad tracks or the east section beyond at least until the intersecting street, 61st South Street, was cut through in 1905. There are nine homes on the east side and their only means of ingress and egress is by means of Second West Street and the city has maintained a pow-

er line down the east side. There is no evidence that the city ever surfaced this section although the west side has been maintained as an oil-surfaced road. There was evidence that this area was used by the Pioneer Nursery Company and its customers. While we do not attempt to here define what evidence is necessary to establish a highway by virtue of an acceptance from the public domain or by dedication from the owner, we agree with the trial court that the evidence of such limited use for such a small section is not sufficient. See Jeremy v. Bertagnole, 101 Utah 1, 116 P.2d 420; Lindsay Land & Livestock Co. v. Churnos, 75 Utah 384, 285 P. 646. The findings and conclusions of the lower court with respect to the width of the road are generally accepted where the court fixed the width in accordance with what is reasonable and necessary considering all the facts and circumstances. Lindsay Land & Livestock Co. v. Churnos, supra.

Since the railroad is at present the owner of the fee of most of the land over which Murray City has an easement, and since the difficulties between the two parties have constantly arisen over the city's using the west side of the street for its public works, we now consider the nature of the rights acquired by the city under U.C.A.1953, 27–1–2 and 27–1–7, supra. The problem is stated in American Law of Property, Vol. II, sec. 9.51, p. 486:

"Where the creation of a public highway operates to vest in the public merely an easement of way rather than the fee, a problem arises as to the uses by the public that come within the exercise of this easement of passage. It has been said that the easement acquired by the public 'includes every reasonablé means for the transmission of intelligence, the conveyance of persons and the transportation of commodities.' [Crullen v. Edison Electric Illuminating Co. of Boston, 254 Mass. 93, 149 N.E. 665, 666] This includes new and undeveloped means of communication as well as those known and customary means existing at the time of the creation of the easement of way. [Dakota Central Tel. Co. v. Spink County Power Co., 42 S.D. 448, 176 N.W. 143] * * *."

"Where the use of the highway * * * involves the subsurface of the way, there is a conflict between this use by the public and the rights of the owner of the fee to utilize the subsoil under the way. Generally the use of the subsurface of a public highway for the construction of sewers, water pipes, and gas or electric conduits has been held to be within the scope of the public easement of passage, where the utilities are for the benefit of the immediate surrounding community. The deprivation of the owner's use of this subsurface is so slight as compared with the benefit to the community as to have been within the contemplation of the parties at the time the public highway was created. But where the construction of the utilities is for the benefit of a distant community, such as a natural gas pipe line or a water main, it has generally been held that such use imposes an additional servitude so as to entitle the owner of the fee to additional compensation. * * * *"

It is obvious that this general statement covers the usual situation where an abutting owner, having no practical use for the subsoil, attempts to demand additional compensation for the public's use of that subsoil after having received payment for the condemnation of a highway right of way. Carpenter v. City of Lancaster, 250 Pa. 541, 95 A. 702. An equitable determination must necessarily favor the public need. In the present case, both parties serve the public and both parties are given the power of condemnation by our statutes, U.C.A.1953, 56–1–5, and U.C.A.1953, 78–34–1(3), to implement their work. The equities in such a case are not so clearly defined.

The railroad contends that, although the placing of water pipes in the land owned by it did not seriously disturb the

use to which it puts the property, other projects might interfere with a proposed underground communications system. We have no evidence on this matter and therefore cannot presently determine the rights of the parties in such instances which might conceivably arise. The legislature has provided for the procedure to be used in eminent domain proceedings, if the parties are unable to agree in contract, stating:

U.C.A.1953, 78–34–8: "The court or judge thereof shall have power:

"(1) To determine the conditions-specified in section 78–34–4; to determine the places of making connections and crossings, and to regulate the manner thereof and of enjoying the common use mentioned in section 78–34–3(5).

"(2) To hear and determine all adverse or conflicting claims to the property sought to be condemned, and to the damages therefor.

"(3) To determine the respective rights of different parties seeking condemnation of the same property."

U.C.A.1953, 78–34–4: "Before property can be taken it must appear:

"(1) That the use to which it is to be applied is a use authorized by law;

"(2) That the taking is necessary to such use; and,

"(3) If already appropriated to some public use, that the public use to which it is to be applied is a more necessary public use."

U.C.A.1953, 78–34–3: "The private property which may be taken under this chapter includes:

\*    \*    \*    \*    \*    \*

"(5) All rights-of-way for any and all purposes mentioned in section 78–34–1 hereof, and any and all structures and improvements thereon, and the lands held or used in connection therewith, shall be subject to be connected with, crossed or intersected by any other right-of-way or improvement or structure thereon; they shall also be subject to a limited use in common with the owners thereof, when necessary; but such uses of crossings, intersections and connections shall be made in the manner most compatible with the greatest public benefit and the least private injury."

Although we are inclined toward the modern view, as expressed in the quotation from American Law of Property, supra, that an easement in the public for right of passage carries with it every reasonable means for public transportation, communication, and serv-

ice, we recognize it as an equitable doctrine of public policy which cannot be applied in all instances. Where the owner of the subsoil devotes that subsoil to a public use, the city, in the absence of an agreement with the owner of the fee, must use its powers of eminent domain so that the issues may be determined in particular under the facts of each case.

The judgment of the lower court is affirmed as modified. Each party to bear its own costs.

CROCKETT, WADE, HENRIOD and WORTHEN, JJ., concur.