UNITED STATES of America,
Plaintiff,

v.

UNION OIL COMPANY OF CALIFOR-
NIA, a California corporation, et al.,
Defendants.

Civ. No. 72–1866 GBH.

United States District Court,
N. D. California.

Oct. 30, 1973.

James L. Browning, Jr., U. S. Atty., and David E. Golay, Asst. U. S. Atty., San Francisco, Cal., for plaintiff.

Gregory A. Harrison, Atherton Phleger, David J. Wynne, Brobeck, Phleger & Harrison, San Francisco, Cal., Lyman A. Garber, Beverly Hills, Cal., Albert D. Elledge and George B. White, Vernon W. Humber and Xenophon Tragoutsis, San Francisco, Cal., for defendants.

## MEMORANDUM OF DECISION

GEORGE B. HARRIS, District Judge.

## I. INTRODUCTION

This matter is before the court on the motion of certain defendants to dismiss for failure to state a claim upon which relief can be granted, and on the counter-motion of plaintiff United States for summary judgment in its favor. The defendants joined in the motion to dismiss are as follows: Union Oil Company of California; Magma Power Company; Thermal Power Company; Alex C. Beigel; Helen V. Dillingham; Frances W. Vought; Louis W. Pellegrini; Ione J. Ottoboni; Patricia Ottoboni; Louis Ottoboni; James Ottoboni; Emma Ottoboni; Albert Ottoboni; Peter Mazzanti; Mrs. Louis Ottoboni Johnson; Ceasar Gianecchini; John Giampaoli; Ilva Giampaoli; Elmer Ferrari; and David Ferrari.

The case arises from a complaint filed herein on October 13, 1972, by which the United States seeks a declaration of its ownership rights in the geothermal steam and associated geothermal resources presently being produced by certain defendants under leases from other defendants. The United States also seeks injunctive relief and damages in the amount of the reasonable rental value of such leased lands for geothermal steam and associated geothermal resources and of the reasonable royalty of the geothermal steam and associated geothermal resources produced therefrom in accordance with the provisions of the Geothermal Steam Act of 1970, 30 U.S.C. § 1001 et seq. The leased lands in question, all of which lie in Sonoma County, California, were granted to defendants' predecessors in interest by patents issued under the Stock Raising Homestead Act of 1916, 43 U.S.C. § 291 et seq. [hereinafter sometimes called the "Act"], and thereafter devolved to certain of the defendants by mesne conveyances.

The claim of the United States is based upon the following language in § 9 of the Stock Raising Homestead Act (43 U.S.C. § 299):

All entries made and patents issued under the provisions of sections 291–301 of this title shall be subject to and contain a reservation to the United States of all the coal and other miner-

als in the lands so entered and patented, together with the right to prospect for, mine, and remove the same.

\* \* \*

It is the position of the United States that the reservation of "all the coal and other minerals" contained in § 9 and in the patents granted thereunder to defendants' predecessors in interest severed the subsurface estate in its entirety from the surface estate, reserving the former to the United States and granting only the latter, thus reserving to the United States the right to "prospect for, mine, and remove" geothermal steam and associated geothermal resources.

Because of uncertainty over whether a mineral reservation such as that cited above encompassed geothermal resources.[1] Congress included § 21(b) in the Geothermal Steam Act of 1970 (30 U.S. C. § 1020(b)) to test its title thereto:

Geothermal resources in lands the surface of which has passed from Federal ownership but in which the minerals have been reserved to the United States shall not be developed or produced except under geothermal leases made pursuant to this chapter. If the Secretary of the Interior finds that such development is imminent, or that production from a well heretofore drilled on such lands is imminent, he shall so report to the Attorney General, and the Attorney General is autho-

rized and directed to institute an appropriate proceeding in the United States district court of the district in which such lands are located, to quiet the title of the United States in such resources, and if the court determines that the reservation of minerals to the United States in the lands involved included the geothermal resources, to enjoin their production otherwise than under the terms of this chapter: *Provided,* That upon an authoritative judicial determination that Federal mineral reservation does not include geothermal steam and associated geothermal resources the duties of the Secretary of the Interior to report and of the Attorney General to institute proceedings, as hereinbefore set forth, shall cease.

The instant case is such an "appropriate proceeding."

## II. DISCUSSION

 The central issue here concerns the meaning and scope of the mineral reservation in the Stock Raising Homestead Act and in the patents granted thereunder. In order to properly construe such reservation, the intent of Congress at the time of the enactment of the Act and under the circumstances then present must be ascertained. *See* Moor v. County of Alameda, 411 U.S. 693, 709, 93 S.Ct. 1785, 36 L.Ed.2d 596

---

1. The basis for such uncertainty is discussed hereinafter; it is summarized in House Report No. 91–1544 on Public Law 91–581, the Geothermal Steam Act of 1970. 3 U.S. Code Cong. & Admin.News p. 5113 at pp. 5115, 5119 (91st Cong., 2d Sess., 1970):

 One reason for the lack of development of the geothermal steam potential of the United States can be directly attributed to the absence of reliable statutory authority to permit its development on public lands. The Department of the Interior has taken the position that it lacks authority to dispose of this resource on lands under its jurisdiction. \* \* \*

 \* \* \* \* \*

 In order to obtain an authoritative judicial determination of the ownership of geothermal resources in lands the surface of which has passed from Federal ownership with a reservation of minerals to the

United States, a new section 20(b) was adopted by the committee. This directs the Attorney General to initiate an appropriate proceeding to quiet the title of the United States to such resources if and when development of such resources occurs or is imminent. The committee is aware that the Department of the Interior has expressed the view that geothermal steam is not subject to the mineral reservation of the Stockraising Homestead Act of December 29, 1916. The committee is also aware that a contrary view has been expressed. As the opinion of the Department is not a conclusive determination of the legal question, it was the sense of the committee that an early judicial determination of this question (upon which the committee takes no position) is necessary. \* \* \*

(1973); United States v. Stewart, 311 U.S. 60, 69, 61 S.Ct. 102, 85 L.Ed. 40 (1940). Although the clear meaning of statutory language is not to be ignored, "'[w]ords are inexact tools at best,' . . . and hence it is essential that we place the words of a statute in their proper context by resort to the legislative history." Tidewater Oil Co. v. United States, 409 U.S. 151, 157, 93 S. Ct. 408, 413, 34 L.Ed.2d 375 (1972).

■ Such intent may be gleaned from several factors, including pertinent committee reports,[2] statements from its sponsors,[3] floor debates,[4] the act's title,[5] successive drafts,[6] and the general purpose of the legislation.[7]

■ In addition, it is the accepted rule of construction that when a grant of land is made by a public body, such as the United States, the language of such grant (and of any reservations therein), if ambiguous, is to be construed strictly against the grantee and broadly in favor of the public body.[8] This rule is the reverse of the normal rule of construction which requires strict construction against the draftsman of the instrument in question (generally the grantor).[9]

■ The Stock Raising Homestead Act grew from Congressional desire to give homesteaders title to substantial-sized tracts of land in the semi-arid states of the West where they could raise livestock and engage in agriculture, thus promoting the settlement and prosperity of such states.

In 1914, a forerunner of the Act was submitted to the House of Representatives, 63d Cong., as H.R. 9582. This bill contained a section reserving to the United States "all the minerals and coal in the lands so entered." 52 Cong.Rec. 3987 (63d Cong., 3d Sess., 1915). The bill was submitted to the Department of the Interior for comment. The Department, through the First Assistant Secretary, commented on H.R. 9582 and on related bill H.R. 6637 and submitted the draft of a proposed revised bill. This substitute, which became H.R. 15799, provided for a reservation "of all the coal and other minerals." *Id.* at 3988.

Representative Raker of California made the following remarks on H.R. 15799:

> One of the purposes of the bill is to restore and improve the grazing capacity of the lands, and therefore stock raising and meat-producing capacity of the semiarid lands of the West, and at the same time to furnish homes thereon for the people of this country who are desirous of acquiring a home in the semiarid country. 52 Cong.Rec.App. 520 (63d Cong., 3d Sess., 1915).

> \* \* \* \* \* \*

> We want homes and not tenants even if the Government of the United States should be that landlord. If water should be later discovered by boring deep wells, then so much the better. The pioneer, who has gone through all the hardship and priva-

2. United States v. St. Paul M. & M. Ry. Co., 247 U.S. 310, 318, 38 S.Ct. 525, 62 L.Ed. 1130 (1918).

3. Woodwork Manufacturers v. NLRB, 386 U.S. 612, 640, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

4. United States v. San Francisco, 310 U.S. 16, 22 n. 10, 60 S.Ct. 749, 84 L.Ed. 1050 (1940); United States v. Hendler, 225 F.2d 106, 109 (10th Cir. 1955).

5. Brown v. Glick Bros. Lumber Co., 52 F. Supp. 913, 916 (S.D.Cal.1943), rev'd on other grounds, 146 F.2d 566 (9th Cir. 1945).

6. Bowles v. Goebel, 58 F.Supp. 686, 688 (D. C.N.D.1945), aff'd, 151 F.2d 671 (8th Cir. 1945).

7. United States v. Shirey, 359 U.S. 255, 260–261, 79 S.Ct. 746, 3 L.Ed.2d 789 (1959).

8. *See* United States v. Union Pacific R. Co., 353 U.S. 112, 116, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957); Oregon Short Line Railroad Company v. Murray City, 2 Utah 2d 427, 277 P.2d 798, 802 (Utah 1954); 3 Sutherland on Statutory Construction § 6402 (3d ed. 1943); 1 Lindley on Mines § 96 (3d ed. 1914).

9. *See* 3 Sutherland § 6503.

tions, will be the man to be benefited. We hope he may. *Id.* at 521.

This bill passed the House, but was not, however, passed by the Senate. Representative Taylor of Colorado explained why as he introduced an identical bill to the next session of Congress:

> This bill [H.R. 407] has been before Congress for two years. This is almost an exact copy of the bill on this subject which passed this House a year ago next Tuesday, January 18, 1915. * * *
>
> * * * * * *
>
> As stated by the commissioner, it was favorably reported by the Senate Public Lands Committee, but owing to the long debate upon the shipping bill, and there being a large number of other important measures upon the Senate calendar ahead of it, the bill failed of passage.
>
> The present bill as introduced is an identical copy of the bill as it passed the House during the last congress.

53 Cong.Rec. 1126 (64th Cong., 1st Sess., 1916).

In debate, Representative Moore of Pennsylvania asked whether the mineral reservation clause in § 10 of the proposed act covered the Government's interest in oil lands. Representatives Moore and Ferris of Oklahoma then engaged in the following colloquy:

> MR. FERRIS. It would. We believe it would cover every kind of mineral. All kinds of minerals are reserved . . . .
>
> MR. MOORE of Pennsylvania. If any oil should be discovered on these lands later on, the Government's right to that oil would be preserved under the mineral clause, would it?
>
> MR. FERRIS. Yes; and further, this act authorizes the reentry upon these lands to extract oil and coal and anything else in the way of minerals that may be on it.
>
> MR. MOORE of Pennsylvania. The gentleman does not think it is necessary to specify oil?

> MR. FERRIS. No. That is a mineral. But I have no objection to it being mentioned specifically if it is at all thought necessary. I feel doubly sure, however, it is not.
>
> MR. MOORE of Pennsylvania. It has been called to my attention that ·the word "mineral" would not include oil.
>
> MR. FERRIS. I do not think it is necessary; but if the gentleman thinks there is any conceivable doubt about it we will put it in, because not a single gentleman from the West who has been urging this legislation wants anybody to be allowed to homestead mineral land * * * But these gentlemen who are interested in it do not want to homestead mineral land or ordinary homestead land or oil land.

53 Cong.Rec. 1171 (64th Cong., 1st Sess., 1916).

In attempting to ascertain the intent of Congress with respect to the mineral reservation contained in the Act, several points become clear. *First,* it is evident from the debates, reports and other legislative history that provision for the reservation of minerals played a minor role in Congressional consideration of the Act. *Second,* it was the intent of Congress that the homesteader receive title to land granted to him by patent under the Act, and that the full mineral estate, including all substances definable as minerals, be reserved to the United States. *Third,* Congress did not intend to reserve geothermal steam and associated geothermal resources because such fluids would not have come within the definitions of "minerals" in force and usage at that time.

■ The United States argues that patents granted under the Act established two separate estates: the surface estate, which passed to the patentee, and the subsurface (mineral) estate which was reserved to the United States. In support of this position the United States points to certain language in the

Act. Section 2 (43 U.S.C. § 292) provides in part cited:

> The Secretary of the Interior is authorized, on application or otherwise, to designate as stock-raising lands subject to entry under sections 291–301 of this title lands the surface of which is, in his opinion, chiefly valuable for grazing and raising forage crops, do not contain merchantable timber, are not susceptible of irrigation from any known source of water supply, and are of such character that six hundred and forty acres are reasonably required for the support of a family * * *.

Section 9 (43 U.S.C. § 299) provides in part cited:

> \* \* \* \* \* \*
>
> Any person who has acquired from the United States the coal or other mineral deposits in any such land, or the right to mine and remove the same, may reenter and occupy so much of the surface thereof as may be required for all purposes reasonably incident to the mining or removal of the coal or other minerals * * *.

The United States also cites certain legislative history in support of its position, as well as the case of Skeen v. Lynch, 48 F.2d 1044 (10th Cir. 1931), cert. den., 284 U.S. 633, 52 S.Ct. 17, 76 L.Ed. 539 (1931). These scattered authorities do not, however, mandate the result sought here by the Government.

Patents under the Act do not grant only the surface estate nor do they reserve the entirety of the subsurface estate. The reservation contained in § 9 speaks of "coal and other minerals"; Congress could have reserved "the subsurface estate" if that is what it desired, but it did not so desire and therefore did not do so. The language quoted above from § 9 merely provides for a right of reentry necessary for the mining and removal of coal and other minerals reserved by the United States. The language quoted from § 2 does not say that land will not be patented; rather it defines such lands by reason of the expected activity to be carried on upon the surface thereof.

Despite the gratuitous references to surface entry which appear in the legislative history of the Act, there is also commentary which supports the position of the defendants here that what passed under an Act patent was fee title, and not just the surface estate with a reservation of the subsurface.

When the predecessor of the Act was proposed before the 63d Congress, Representative Fergusson of New Mexico made the following comment:

> Mr. Speaker, the object of this bill is to restore the beef and mutton producing capacity of the semiarid states of the West, and at the same time enable the settlers to get homes, and thus promote the settlement and prosperity of these semiarid states by inducing settlers to get title to the land and to become taxpayers. 52 Cong.Rec. 1807 (63d Cong., 3d Sess., 1915).

And thus did Representative Raker indicate his belief that the homesteader would be entitled to keep any water he might find in the land granted to him. 52 Cong.Rec.App. 521 *supra*.

Revealing here is the following colloquy between Representative Ferris and Representative Mondell of Wyoming:

> MR. FERRIS. Mr. Chairman, on page 7, lines 24 and 25, and on page 8 this law is made subject to all of the three surface-entry bills that we have passed, and those three laws provide for damage and everything else.
>
> MR. MONDELL. Where is that?
>
> MR. FERRIS. On page 7, lines 24 and 25:
>
>> The coal and other mineral deposits in such lands shall be subject to disposal by the United States in accordance with the provisions of the coal and mineral land laws in force at the time of such disposal.
>
> MR. MONDELL. Those are not the so-called limited-entry laws, affecting

the limited entryman, but the laws affecting the miner.

MR. FERRIS. The three surface-entry acts already passed. They are the laws already referred to.

MR. MONDELL. The gentleman is entirely mistaken, and, further, I wish he would not call the laws he refers to surface-entry laws, for they are not. They convey fee titles. They give the owner much more than the surface; they give him all except the body of the reserved mineral. 53 Cong.Rec. 1233–1234 (64th Cong., 1st Sess., 1916)

Skeen v. Lynch, *supra*, relied upon by the United States, was a quiet title action brought against the Government under the Stock Raising Homestead Act. The plaintiff there contended that he owned the water, oil and gas in and under land patented to him pursuant to the Act and that such was not retained by the United States by its reservation of "coal and other minerals." The court concluded, 48 F.2d at 1046:

> We accept the assumed fact [that oil and gas were reserved to the United States] as irrefutable. The legislative history of the Stockraising Homestead Act when it was reported for passage including the discussion that followed relevant to this subject leave us no room to doubt that it was the purpose of Congress in the use of the phrase "all coal and other minerals" to segregate the two estates, the surface for stock-raising and agricultural purposes from the mineral estate, and to grant the former to entrymen and to reserve all of the latter to the United States. \* \* \*

With evidence of a contrary legislative intent such as that cited hereinabove, however, the conclusion reached by the *Skeen* court leaves considerable room for doubt. A more recent case, State ex rel. State Highway Commission v. Trujillo, 82 N.M. 694, 487 P.2d 122 (N.M.1971), gives greater credence to the expressed intent of Congress and therefore limits

*Skeen*, a result with which this court is in agreement.

*Trujillo* involved an appeal in a condemnation case in which it had been determined below that road building material from certain landowners' property belonged to the Government under the reservation contained in the Stock Raising Homestead Act and the patents granted thereunder and that as a consequence the Government need not have reimbursed the landowners for taking such material (there a substance called monzonite).

The trial court had held that the mineral reservation severed the surface estate from the mineral or subsurface estate and that the patents had reserved all subsurface rights to the Government.

On appeal, the Supreme Court of New Mexico disagreed, holding that the reservation of "coal and the other minerals" was not intended to include rock, such as monzonite. The court discussed and distinguished *Skeen*, finding the "two estate" analysis used there unnecessary. The court said at 125:

> We find nothing in the statute as enacted which indicates an intention to create two estates or to grant the entryman use of the surface only. Had such been the intention of the Congress, it would have been a simple matter for it to have said so. Rather than reserving *all* the subsurface estate only minerals *in* the land were reserved.

> Although we have no quarrel with the result of Skeen that oil and gas are minerals, we cannot subscribe to the theory of Skeen and the trial court that the Congress intended the entryman to have use of the surface only.

Other cases support the conclusion that the patents granted here conveyed title to the land and not just use of the surface. *Cf.* Schwab v. Beam, 86 F. 41, 43 (C.C.1898); Mortenson v. Financial Growth, Inc., 23 Utah 2d 54, 456 P.2d 181, 183 (1969).

■ The Government's next argument is that geothermal steam and associated geothermal resources were reserved to the United States because they are "minerals" within the meaning of the mineral reservation in § 9 of the Act and the patents granted thereunder.

Webster's Third International Dictionary (1965) defines "geothermal" as "of or relating to the heat of the earth's interior." Section 2(c) of the Geothermal Steam Act of 1970 (30 U.S.C. § 1001(c)) provides the following definitions:

> (c) "geothermal steam and associated geothermal resources" means (i) all products of geothermal processes, embracing indigenous steam, hot water and hot brines; (ii) steam and other gases, hot water and hot brines resulting from water, gas, or other fluids artificially introduced into geothermal formations; (iii) heat or other associated energy found in geothermal formations; and (iv) any byproduct derived from them;

"Geothermal energy" has been defined most succinctly as "the natural heat of the earth which can be extracted in the form of hot water and/or water vapor (steam)." State of Calif., The Resources Agency, Energy in California 38 (Jan. 1973).

Geothermal manifestations have been noted by man since the first century B.C.[10] The first commercial development, however, did not occur until 1818, when the geothermal steam of the Larderello area in Italy was used to provide heat in order to concentrate the boric acid which was found in solution in the boiling waters. Geothermal energy was not applied to electrical power until 1904, when Prince Conti of Larderello succeeded in operating a geothermal steam-driven dynamo which lighted five electric lamps. By the late 1930's the Larderello fumarole area, consisting roughly of 100 sq. miles. was producing almost 100,000 kw. of electric power.

Despite the Italian successes, little attention was paid to geothermal development elsewhere except for the use of steam and hot water in geyser areas in Iceland and in parts of the Soviet Union. In 1950 a major geothermal project was launched in New Zealand.

In the United States, geothermal steam was not generally regarded as suitable for commercial development until quite recently.[11] What geothermal exploration has occurred has been concentrated in the West, most notably California. The first commercial geothermal power plant in California became operative in 1960 at The Geysers in Sonoma County. As of 1971, geothermal fluids were being used to heat buildings and even whole cities in such places as the United States, the Soviet Union, Iceland, Hungary, Japan and New Zealand.[12]

Virtually all the literature on the nature and development of geothermal resources in the United States dates from after World War II.[13] Indeed, the parties have cited no literature in existence at the time when the Stock Raising Homestead Act was presented, debated or passed which would indicate an awareness on the part of Congress that such resources had to be accounted for. It is hardly surprising, then, that the legislative history of the Stock Raising Act includes no references to geothermal

---

10. This history of the development of geothermal energy is taken primarily from J. Brooks, Jr., "Legal Problems of the Geothermal Industry," 6 Nat. Resources J. 511 *passim* (1966) and sources cited therein.

11. 3 U.S.Code Cong. & Admin.News p. 5115 (91st Cong., 2d Sess., 1970).

12. State of Calif., The Resources Agency, The Economic Potential of Geothermal Resources in California: a Report of the Find-

ings and Recommendations in Response to Senate Resolution 331 (1970) at 11 (Jan. 1971).

13. *E. g.*, the selected bibliography in *id.*, footnote 12, lists 28 items, of which one is dated 1942, one 1944, and the remainder 1960 or later. One earlier source is N. H. Darton, "Geothermal Data of the United States" (U.S. Geological Survey Bull. No. 701, 1920).

phenomena nor that any mention thereof appears in the reservation of § 9.[14]

Since it is clear that Congress expressed no intent on the question of whether "other minerals" in § 9 of the Act included geothermal steam and associated geothermal resources, the Government must press the contention that the main constituent of geothermal energy, namely superheated water (or steam) was a "mineral" within the contemplation of Congress and the meaning of the mineral reservation in § 9. Such a construction will not hold water: the authorities are convincing that water was not considered a mineral when § 9 was enacted, nor is water considered a mineral today.

■ The word "mineral" is used in many senses and does not have a single definite meaning. Bumpus v. United States, 325 F.2d 264, 266 (10th Cir. 1963). In its broadest sense "mineral" encompasses that vast realm of everything other than animal or vegetable. A dictionary current at the time of the enactment of the Act defined "mineral" broadly enough to include water.

> 1. An inorganic homogeneous substance of definite or approximately definite chemical composition, found in nature.
>
> Minerals, though commonly solid, may exist in a gaseous, liquid, or viscid state. Water is a mineral that solidifies at 32° Fahrenheit. Funk & Wagnalls New Standard Dictionary of the English Language (1913 ed.).

It is not this general meaning that is controlling, however, for the word mineral is necessarily subject to interpretation by reason of its context and particular usage. Thus the following approach has been adopted:

> We are of the opinion that in deciding whether or not in a particular case exceptional substances are minerals that the true test is what that word means in the vernacular of the mining and mineral industry, the commercial world and the landowners at the time of the grant, and whether the particular substance was so regarded as a mineral. Fleming Foundation v. Texaco, 337 S.W.2d 846, 852 (Tex.Civ. App.1960).

See also Thomas v. Markham & Brown, Inc., 353 F.Supp. 498, 501 (E.D.Ark. 1973); Mack Oil Company v. Laurence, 389 P.2d 955, 961 (Okl.1964).

The strong weight of the authority is that water was not considered to be a mineral, within the test just stated, either when the Stock Raising Homestead Act was enacted or when the subject patents were granted thereunder.[15]

One contemporaneous authority defined mineral as follows:

> Mineral is any constituent of the earth's crust, more especially an inorganic body, occurring in nature homogeneous and having a definite chemical composition which can be expressed by a chemical formula, and having certain distinguishing characteristics, and which is capable of being got from the earth for the purpose of profit. Ricketts on Mines § 99 (1911).

Another offered this definition:

> The real test seems to be the character of the deposit as occurring inde-

---

14. The fact that geothermal steam or associated geothermal resources were not known at the time does not, of course, prevent their reservation to the United States under § 9 of the Stock Raising Homestead Act if they otherwise qualify as "minerals" within the intendment of that provision. See Rowe v. Chesapeake Mineral Co., 156 F.2d 752, 755 (6th Cir. 1946), cert. den., 329 U.S. 776, 67 S.Ct. 190, 91 L.Ed. 667 (1946); New Mexico and Arizona Land Company v. Elkins, 137 F.Supp. 767, 771–773 (D.N.M.

1956); Cain v. Neumann, 316 S.W.2d 915, 922 (Tex.Civ.App.1958); 1 American Law of Mining § 3.23 (1972). But see State of Wyoming v. Udall, 379 F.2d 635, 638 (10th Cir. 1967), cert. den., 389 U.S. 985, 88 S.Ct. 470, 19 L.Ed.2d 479 (1967); Ahne v. Reinhart and Donovan Company, 240 Ark. 691, 401 S.W.2d 565, 569 (Ark.1966).

15. But see Hathorn v. Natural Carbonic Gas Co., 194 N.Y. 326, 87 N.E. 504 passim (N. Y.1909), and cases cited therein.

pendently of the mere soil, valuable in itself for commercial purposes, that is, near enough to a market to have a value. [Footnote omitted.] 1 Lindley § 93.

In its listing of minerals, Lindley does not include water. 3 Lindley at 2740–2741.

A review of the United States Geological Survey's annual Mineral Resources of the United States for both metals and non-metals for the years 1913, 1914 and 1916 (published respectively in 1914, 1917 and 1919) shows no listing for water, salt water, steam or geothermal resources. There is a similar absence of listings in G. English, Descriptive List of the New Minerals 1892–1938 (1939), a book which updated Dana's System of Mineralogy (6th ed. 1892). And the only listing in Eakle, Minerals of California (State Mining Bureau. Bull. No. 67, 1914) is for water in the form of mineral springs. *Id.* at 63.

A strong line of authority supports the view that today water is still not considered a mineral. *See* Mack Oil Company v. Laurence, *supra*, 389 P.2d at 961 (reservation of "all the minerals" held not to include subterranean waters); Fleming Foundation v. Texaco, *supra*, 337 S.W.2d at 847 (reservation of interest "in all of oil, gas and other minerals in, under and that may be produced from the lands conveyed" held not to include subsurface water"; Vogel v. Cobb, 193 Okl. 64, 141 P.2d 276, 280 (1943) (conveyance of " 'oil, petroleum, gas, coal, asphalt and all other minerals of every kind or character in and under and that may be produced from' said real property" and conveyance of all "oil, gas and other minerals in and under and that may be produced from" said land held not to include water under "other minerals"); Stephen Hays Estate v. Togliatti, 85 Utah 137, 38 P.2d 1066, 1068 (1934) (exception of "all minerals on or in the land conveyed" held not to include water containing copper in solution); 54 Am.Jur.2d "Mines and Minerals" § 9; Palache, Berman, Frondel, Dana's System of Mineralogy

(7th ed. rewritten 1951) (no listing for water, salt water, steam, or geothermal steam). *But see* Note "Acquisition of Geothermal Rights" 1 Idaho L.Rev. 49, 56–57 (1964).

The matter is summarized in 1 Williams & Meyers, Oil and Gas Law § 219.-6 (1972):

> Certainly water has been described as a "mineral" in certain contexts, [footnote omitted] but we are doubtful that in the ordinary mineral grant or reservation or mineral lease that the parties contemplate that water is described by the term "minerals." Under these circumstances we are led to the conclusion that very slight intrinsic evidence in the instrument should be sufficient to establish that water was not included in the term minerals as used by the parties. \* \* \*

The conclusions reached above are strengthened by reference to interpretations of the Act and the mineral reservation therein by the Department of the Interior, the agency charged with administration of the Act.

It is evident that since 1961 the Department of the Interior has held and disseminated the opinion that geothermal steam and associated geothermal resources are not minerals. In 1961 the Acting Solicitor of the Department of the Interior wrote a memorandum to the Director of the Bureau of Land Management expressing the view that the Department lacked authority to dispose of geothermal steam contained in public lands under the Materials Act of 1947. Dept. of Int. Mem. M–36625 (Aug. 28, 1961).

With specific reference to mineral reservations under the Stock Raising Homestead Act, in 1965 the Office of the Solicitor expressed the view in two opinion letters that geothermal steam is merely superheated water, that water has not been treated as a mineral in public land laws, and that as a result mineral reservations under the Act do not include geothermal steam. The let-

ter to Mrs. H. S. Gilmore of Sacramento recited that,

> A party holding land under a patent issued pursuant to the Stock-Raising Homestead Act would thus have the undisputed right to produce geothermal steam energy from his land. 3 U. S.Code Cong. & Admin.News, p. 5126 (91st Cong., 2d Sess., 1970).

The second letter, to Mr. Walter P. Capaccioli of South San Francisco, concluded that,

> As we have pointed out in answer to your first question, geothermal steam is not a mineral within the meaning of the public land laws. Hence, it is subject neither to the general mineral reservation of the Stock-Raising Homestead Act nor to location under the mining law. *Id.* at U.S. Code Cong. & Admin.News 1970, p. 5128.

For full text of these letters see Appendix A hereto.

The letter to Mr. Capaccioli referred to land owned by the Ottobonis, who are named as defendants in the instant action.

The same interpretation was given in a letter dated February 16, 1966, from the Department's Associate Solicitor for Public Lands to counsel for defendant Magma Power Company.

The Department of the Interior continued to adhere to the above opinions in a letter from the Assistant Secretary of the Interior to Congressman Wayne N. Aspinall, Chairman of the Committee on Interior and Insular Affairs of the House of Representatives, dated August 31, 1970, and cited in 3 Code Cong. & Admin.News p. 5121 (91st Cong., 2d Sess., 1970).

■ In addition, the Department of the Interior has taken the position in letters to members of Congress that geothermal steam is not locatable. It appears from the language of § 9 of the Act that Congress was concerned with reserving locatable minerals only, and since geothermal resources are not locatable within the meaning of the mining laws, they were not reserved.

■ The foregoing consistent expressions from the Department of the Interior must be given that weight due an agency's interpretations of its governing laws. As recently stated by the Supreme Court in Investment Co. Institute v. Camp, 401 U.S. 617, 626–627, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971):

> It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute.

This rule applies with equal force to interpretations expressed by the Department of the Interior. *See* Udall v. Tallman, 380 U.S. 1, 4, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Knowles v. Butz, 358 F.Supp. 228, 231 (N.D.Cal.1973).

Here, the above interpretations not only strike this court as eminently reasonable, but well within the weight of authority on the issues presented thereunder. The interpretations of the Department are supported by the pertinent provisions of the Act and are not contrary to the expressed (or interpreted) intent of Congress. Accordingly, this court will accord such interpretation the "due deference" and "great weight" called for by the cases.

In view of the foregoing, this court need not reach the question of whether the facts here give rise to a claim of estoppel against the Government within the narrow ambit of that doctrine as expressed in such cases as Manloading & Management Assoc. Inc. v. United States, 461 F.2d 1299, 1303, 198 Ct.Cl. 628 (1972) and United States v. Georgia-Pacific Company, 421 F.2d 92, 95 *passim* (9th Cir. 1970).

## III. CONCLUSION

For the reasons given above, defendants' motion to dismiss for failure to state a claim upon which relief can be founded is hereby granted, and plain-

tiff's motion for summary judgment in its favor is hereby denied. It is so ordered.

### APPENDIX A

The two letters reproduced below are cited in 3 U.S.Code Cong. & Admin. News pp. 5126–5128 (91st Cong., 2d Sess., 1970.)

U. S. Department of the Interior,
Office of the Solicitor,
Washington, D.C., December 16, 1965.

Mrs. H. S. Gilmore,
Gilmore & Gilmore,
1005 Eighth Street, Sacramento, Calif.

Dear Mrs. Gilmore: The Director of the Bureau of Land Management has referred your letter of October 5, 1965, regarding geothermal steam resources to our Office. Your primary question is whether geothermal steam has been reserved to the United States in lands patented under the Stock Raising Homestead Act (43 U.S.C. 291–301), section 9 of which (43 U.S.C. 299) provides that " * * * patents issued under the provisions of this act shall be subject to and contain a reservation to the United States of all the coal and other minerals in the lands so patented * * *."

Geothermal steam is essentially just subterranean water heated to a high temperature. In Solicitor's Opinion M–36625 (August 28, 1961) it was stated that "from an examination of the pertinent sections of a report prepared for a United Nations Conference by the Geological Survey entitled 'Preliminary Evaluation of Geothermal Areas by Geochemistry, Geology, and Shallow Drilling,' we conclude that geothermal steam is developed from hot spring systems and that the greatly dominant component to these systems is meteoric water, that is, of atmospheric origin." Water, particularly subterranean water, is normally classified as a mineral. See article on "Mineralogy" in Encyclopae-

dia Brittanica, XV 501 (1965); "Water" 93 C.J.S. 580; "Mines and Minerals," § 2(b)(7), 58 C.J.S. 24; Hathorn v. Natural Carbonic Gas Co. [194 N.Y. 326] 87 N.E. 504, 508 (N.Y. 1909). However, it is recognized that water differs from other minerals and must be treated differently from a legal point of view. Erickson v. Crookston Water, Power & Light Co. [100 Minn. 481] 111 N.W. 391, 393 (Minn.1907). Courts have held that a reservation of minerals does not reserve water. Fleming Foundation v. Texaco, 337 S.W.2d 846, 850 [Tex. Civ.App.] (Tex.1960); Mack Oil Co. v. Laurence, 389 P.2d 955, 961 (Okla. 1964); see charge of the court in Estate of Genevra O'Brien v. United States, 8 Oil and Gas Reporter 845; 846 (U.S.D.C., N.D.Tex.1957).

Water has not been treated as a mineral in the public land laws. The Congress has enacted special statutes about water, and to the best of our knowledge there is no statute in which water is treated as a mineral. As we have concluded that geothermal steam is really water, it would thus be anomalous to assert that geothermal steam was subject to the mineral reservation of the Stock-Raising Homestead Act, and the answer to your question must consequently be that the reservation does not cover geothermal steam.

A party holding land under a patent issued pursuant to the Stock-Raising Homestead Act would thus have the undisputed right to produce geothermal steam energy from his land. Any minerals connected with the geothermal steam would, however, appear to be subject to the mineral reservation. Title to them would be in the United States, and the patentee could not acquire title to them by producing geothermal steam.

It is also possible that Executive Order No. 5389 of July 7, 1930, may affect some land patented under the Stock Raising Homestead Act. By Executive Order 5389 the President is deemed to have withdrawn the waters

of hot springs and springs the waters of which have curative properties, and also the land containing them. The purpose of the withdrawal was to preserve these springs for general public use and benefit in order that they might be leased under the act of March 3, 1925 (43 Stat. 1133; 43 U. S.C. 971), and the pertinent regulations, 43 CFR 2321.1–2(b). The withdrawal by this Executive order is a continuing one and attaches to any lands which at the time of its issuance were, or which subsequently become, of the character and status defined in the order. Cf. State of New Mexico, 55 I.D. 466 (1936).

Under that order it would seem quite possible that, if any land containing hot springs was patented subsequent to the promulgation of Executive Order 5389, its conveyance by the United States to the patentee was unauthorized. However, before we comment further on such matters, it would be necessary to have full factual information about each particular case.

Sincerely yours,

Edward Weinberg,
Deputy Solicitor.

U. S. Department of the Interior,
Office of the Secretary,

Washington, D.C., December 16, 1965.

Mr. Walter P. Capaccioli,
384 Grand Avenue, Post Office Box 876,
South San Francisco, Calif.

Dear Mr. Capaccioli: Assistant Secretary Cain has asked that we reply to your letter of August 27, 1965, in which you ask several questions about geothermal steam in lands patented with a mineral reservation under the Stock-Raising Homestead Act (43 U. S.C. 291–301). Section 9 of that statute (43 U.S.C. 299) provides that " * * * patents issued under the provisions of this act shall be subject to and contain a reservation to the United States of all the coal and other

minerals in the land so * * * patented * * * " Your primary question is whether geothermal steam has been reserved to the United States by such a reservation.

Geothermal steam is essentially just subterranean water heated to a high temperature. In Solicitor's Opinion M–36625 (August 28, 1961), it was stated that "from an examination of the pertinent sections of a report prepared for a United Nations Conference by the Geological Survey entitled 'Preliminary Evaluation of Geothermal Areas by Geochemistry, Geology, and Shallow Drilling,' we conclude that geothermal steam is developed from hot spring systems and that the greatly dominant component in these systems is meteoric water, i. e., of atmospheric origin."

Water, particularly subterranean water, is normally classified as a mineral. See article on "Mineralogy" in Encyclopaedia Brittanica, XV 501 (1965); "Water" 93 C.J.S. 580; "Mines and Minerals," § 2(b)(7), 58 C.J.S. 24; Hathorn v. Natural Carbonic Gas Co. [194 N.Y. 326], 87 N.E. 504, 508 (N.Y.1909). However, it is recognized that water differs from other minerals and must be treated differently legally. Erickson v. Crookston Water, Power & Light Co. [100 Minn. 481], 111 N.W. 391, 393 (Minn.1907). Courts have held that a reservation of minerals does not reserve water. Fleming Foundation v. Texaco, 337 S.W.2d 846, 850 [Tex. Civ.App.] (Tex.1960); Mack Oil Co. v. Laurence, 389 P.2d 955, 961 (Okla. 1964); see charge of the court in Estate of Genevra O'Brien v. United States, 8 Oil & Gas Reporter 845, 846 (U.S.D.C., N.D.Tex.1957).

Water has not been treated as a mineral in the public land laws. The Congress has enacted special statutes about water, and, to the best of our knowledge, there is no statute in which water is treated as a mineral. As we have concluded that geothermal steam is really water, it would, thus,

## 1302

be anomalous to assert that geothermal steam was subject to the mineral reservation of the Stock-Raising Homestead Act, and the answer to your first question must, consequently, be that the reservation does not cover geothermal steam.

Your second question is whether Executive Order No. 5389 of July 7, 1930, affects your clients' land. Your clients purchased the land in 1941 from a party which had obtained it from the United States under the Stock-Raising Homestead Act on July 16, 1931. By Executive Order 5389, the President is deemed to have withdrawn the waters of the hot springs and springs the waters of which have curative properties and the land containing them. The purpose of the withdrawal was to preserve these springs for general public use and benefit in order that they might be leased under the act of March 3, 1925 (43 Stat. 1133; 43 U.S.C., sec. 971) and the pertinent regulations, 43 CFR 2321.1–2(b). The withdrawal by this Executive order is a continuing one and attaches to any lands which at the time of its issuance were, or which subsequently become, of the character and status defined in the order. Cf. State of New Mexico, 55 I.D. 466 (1936).

Under that Executive order it would seem that, if the land held by your clients contains hot springs, it should not have been conveyed to their predecessors in interest under the Stock-Raising Homestead Act. However, we do not have full information about your clients' land at this time. We do not, for example, know what the actual conditions on the land were at the time the patent was issued. Consequently, we are unable to determine whether or not the land was properly patentable under the Stock-Raising Homestead Act.

The answer to your third question is that the legislation under consideration applies solely to geothermal steam owned by the United States.

As we have pointed out in answer to your first question, geothermal steam is not a mineral within the meaning of the public land laws. Hence, it is subject neither to the general mineral reservation of the Stock-Raising Homestead Act nor to location under the mining law.

In view of our answers to your first four questions, the answer to both your fifth and your sixth questions is that your clients presumably own the geothermal steam in their land.

Sincerely yours,

Edward Weinberg,
Deputy Solicitor.